Carl J. CLARK, Appellant,

v.

STATE of Alaska, Appellee.

No. 311.

Supreme Court of Alaska.

Jan. 30, 1964.

---

Wendell P. Kay, of Kay & Miller, David J. Pree, Anchorage, for appellant.

Robert C. Erwin, Dist. Atty., and Dorothy Awes Haaland, Asst. Dist. Atty., Anchorage, for appellee.

Before NESBETT, C. J., and DIMOND and AREND, JJ.

AREND, Justice.

The appellant Clark was sentenced to life imprisonment after a trial by jury in which he was found guilty of the crime of inciting one Salvador Gamez Soto to commit murder (Count I) and was adjudged to be an habitual criminal (Count II).

While the appellant was in jail awaiting trial, the superior court, on the state's motion, appointed two psychiatrists to examine him as to his mental competency. After the psychiatrists had examined the appellant and made written reports on their findings, the court held a hearing on June 20, 1962, pursuant to chapter 104, SLA 1960,[1] as to the mental competency of the appellant to stand trial. At the con-

---

1. The first two sections of chapter 104, SLA 1960 provide:

"Section 1. Whenever after arrest and prior to the imposition of sentence or prior to the expiration of any period of probation the Attorney General or the District Attorney has reasonable cause to believe that a person charged with an offense against the State of Alaska may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense, he shall file a motion for a judicial determination of such mental competency of the accused, setting forth the ground for such belief with the trial court in which proceedings are pending. Upon such a motion or upon a similar motion in behalf of the accused, or upon its own motion, the court shall cause the accused, whether or not previously admitted to bail, to be examined as to his mental condition by at least one qualified psychiatrist, who shall report to the court. For the purpose of the examination the court may order the accused committed for such reasonable period as the court may determine to a suitable hospital or other facility to be designated by the court. If the report of the psychiatrist indicates a state of present insanity or such mental incompetency in the accused, the court shall hold a hearing, upon due notice, at which evidence as to the mental condition of the accused may be submitted, including that of the reporting psychiatrist, and make a finding with respect thereto. No statement made by the accused in the course of any examination into his sanity or mental competency provided for by this section, whether the examination shall be with or without the consent of the accused, shall be admitted in evidence

clusion of the hearing the court found that the appellant, although oriented as to time and place and knowledgeable of the charges against him, was not competent to assist in his own defense. So the court ordered him committed to an institution for psychiatric treatment "until released and certified by competent authority to have sufficient soundness of mind to appreciate the charges against him and to enable him to make a proper defense."

The appellant was admitted to Morningside Hospital [2] at Portland, Oregon, on August 15, 1962, for psychiatric evaluation. Twenty-six days later the medical director of the hospital informed the court by letter that the appellant was not found to be psychotic and was competent to make a proper defense. Thereupon the appellant was returned to Alaska by order of the court, the amount of his bail fixed and his trial set for October 15, 1962.

In all proceedings up to this point the appellant had been represented by his own or court-appointed counsel, and on the day set for trial he was informed by the court of his right to be represented by counsel but he insisted that he would represent himself in the trial of the case.

At the trial it developed that a good deal of the state's case was based upon the testimony of Salvador Gamez Soto (hereinafter referred to as Gamez) who related that the appellant had offered to pay him for placing a dynamite bomb in the automobile of one Harry Pike, a city jailer. Gamez described the bomb as being made of three sticks of dynamite, with an electric blasting cap attached and said that the appellant showed him how to disconnect one of the wires leading from the distributor head of an automobile and then to connect in its place the wire from the blasting cap. Gamez immediately reported the incident to the police and then under their direction and surveillance proceeded to carry out the appellant's instructions to him. This culminated in the confiscation of the bomb in question [3] and the arrest of the appellant. At one point in his testimony Gamez stated that the appellant had wanted him to blow up seven automobiles in all—one every two days—and offered him $150 for each car.

The appellant did not take the witness stand on the count charging incitement to murder but during the course of examining other witnesses and addressing the court and jury he managed to get into the record many statements presenting his version of the facts and circumstances which resulted in his being "framed" on the charges brought against him.

By the third day of the trial and just about the time that the appellant was ready

---

against the accused on the issue of guilt in any criminal proceeding. A finding by the judge that the accused is mentally competent to stand trial shall in no way prejudice the accused in a plea of insanity as a defense to the crime charged; such finding shall not be introduced in evidence on that issue nor otherwise be brought to the notice of the jury."

"Sec. 2. Whenever the trial court shall determine in accordance with Section 1 of this Act that an accused is or was mentally incompetent, the court may commit the accused to the custody of the Commissioner of Health and Welfare or his authorized representative, until the accused shall be mentally competent to stand trial or until the pending charges against him are disposed of according to law."

2. Morningside Hospital is authorized by contract with the Alaska Department of Health and Welfare to provide care and treatment for Alaskans who are mentally ill.

3. A police officer, who examined the bomb, stated that it consisted of three sticks of Hercules brand dynamite, eighty per cent nitro glycerin, wrapped with friction tape. In the center of the three sticks was lodged an electric cap for detonation, from which extended thirty-six inches of electric cap wire. A three-inch spark plug wire was inserted on the ends of the wire coming from the electric cap. A laboratory agent of the Federal Bureau of Investigation testified that a bomb of the kind just described would create "quite an explosion" and, if plugged into a distributor cap of an automobile, would likely shatter "the bulkhead right in front of the driver" and "the whole front seat would be completely damaged."

to rest his case in chief he made this request of the court:

"I want to ask for an attorney to help me from here on out, because I don't want to make a mess out of things after I've got it this far."

The district attorney seems to have responded sympathetically to the appellant's suggestion for he stated to the court:

"Mr. Clark has indicated that he wishes to have an attorney on this matter. I would suggest—there are certain parts of that record, it seems to me, that have a very—would have almost a prejudicial effect on Mr. Clark's defense. I would suggest, certainly, before anything is done that Mr. Clark consult his attorney, if he is going to have one, and his attorney can advise him."

After indicating to the parties that he did not consider that an attorney could be of much help to the appellant on matters of defense relating to Count I of the indictment since that phase of the trial was practically completed, the trial judge did appoint an attorney to represent the appellant. He then declared a one-day recess to give the attorney an opportunity to listen to the electronic recording of what had transpired at the preliminary hearing and the first three days of the trial of the appellant.

Immediately after the recess appellant's counsel presented a number of motions to the court, one of these being that the court declare a mistrial for the reason that there was never a proper determination that the appellant upon his return from Morningside Hospital was then competent to stand trial. The motion was summarily denied and the appellant now specifies that the court erred in permitting him to be tried without a hearing and judicial determination that he was competent, after he had been judicially determined to be incompetent. Whether it was error for the trial court to rule as it did

upon the appellant's motion depends upon the meaning to be attached to that portion of section 2 of chapter 104, SLA 1960[4] which states that, when an accused person is judicially determined to be mentally incompetent, the court may order him to be institutionalized "until the accused shall be mentally competent to stand trial."

Sections 1 and 2 of chapter 104, SLA 1960, have never been up for consideration by this court before. We note, however, that their provisions are identical with those contained in sections 4244 and 4246 of title 18 U.S.C.A. (1951),[5] which were several times construed prior to 1960 by the United States Court of Appeals for the District of Columbia Circuit with respect to the issue here presented. That court in the leading case of Gunther v. United States[6] held that, after an accused had been judicially determined incompetent to stand trial under 18 U.S.C.A. §§ 4244 and 4246, it was error for the trial court to proceed with his trial without other preliminary than the certificate of the superintendent of the mental hospital to which he had been committed that the accused had recovered his reason, was again of sound mind, and had been discharged from treatment. Explained the court:

"Section 4244 describes the motion initiating proceedings as 'a motion for a *judicial determination* of * * * mental competency of the accused * * *.' A judicial finding of mental *incompetency,* far from discharging the court's duty in response to such a motion, creates a greater necessity than previously existed for a judicial determination of competency.

"If the question were merely whether a mentally incompetent person should be discharged from further hospitalization, it might well be left to the sole judgment of the hospital officials. Indeed, in related sections where that is the question, Congress has entrusted it

4. See note 1, supra.
5. Act of Sept. 7, 1949, ch. 535, § 1, 63 Stat. 686.

6. 94 U.S.App.D.C. 243, 215 F.2d 493 (1954).

to administrative officials.[7] But the question here is not merely whether one who has previously been adjudged incompetent shall be discharged from further hospitalization, but, rather, whether such a person is competent to stand trial; in the language of the statute "to understand the proceedings against him or [and] properly to assist in his own defense". While, of course, expert psychiatric judgment is relevant on this question, it cannot be controlling. Resolution of this issue requires not only a clinical psychiatric judgment but also a judgment based upon a knowledge of criminal trial proceedings that is peculiarly within the competence of the trial judge. That Congress recognized this is borne out by the fact that § 4246, providing for the commitment of persons found incompetent under § 4244, withholds the blanket authority to terminate custody which Congress has given to administrative officials where capacity to stand trial is not an issue."[8]

Four months later, November 24, 1954, the same court expressed its opinion in the case of Kelley v. United States[9] as to what constitutes a sufficient motion for a judicial determination of competency of an accused to stand trial after a prior determination of his incompetency and order of commitment for treatment. Kelley, who had been indicted for robbery and pleaded not guilty, was found not competent to stand trial after a court hearing pursuant to 18 U.S. C.A. § 4244 and committed to St. Elizabeths Hospital. On February 13, 1953, the superintendent of the hospital certified that Kelly had recovered his reason, was of sound mind and had been discharged that day.

Eight months later the case was called for trial. Kelley's counsel then asked the court, presided over by another judge, to order a re-examination, pointing out to the court the prior commitment and referring to the record from St. Elizabeths of Kelley's return to sanity and discharge as not conclusive. Counsel also informed the court that he had talked to Kelley for about twenty minutes and felt that he was not prepared to go to trial and that the two doctors who had testified at the prior hearing "will testify even now that the man is insane." The court denied the motion and the case went to trial. The court of appeals ruled that the motion was well-founded and should have been granted. In so ruling, the court called attention to the fact that in the Gunther case it had held that even in the absence of any motion a judicial determination of mental competency to stand trial is required when, in circumstances like those in Kelley's case, there has been an earlier judicial determination of incompetency and no subsequent judicial determination of competency.[10]

Next in line appears the case of Taylor v. United States,[11] in which the court of appeals epitomized the rule first announced in Gunther as follows:

"When an accused person has been judicially found incompetent to stand

---

7. In civil proceedings relating to the mental competency, the Alaska legislature has specificically provided that when a person has been judicially determined to be mentally incompetent and ordered committed to a mental hospital, he shall be released on convalescent status or completely discharged by the head of the hospital whenever such head shall determine that convalescent status is in the best interest of the patient or that the patient should be discharged because the conditions justifying hospitalization no longer exist, whichever the case may be. See AS 47.30.070, 47.30.200 and 47.30.220.

8. Id. at 496–97 of 215 F.2d. The holding in the Gunther case, discussed in the text above, was decided on July 1, 1954, and was followed by another division of the Court of Appeals for the District of Columbia Circuit two weeks later, on quite similar facts, in Contee v. United States, 94 U.S.App.D.C. 297, 215 F.2d 324, 327–28 (1954).

9. 95 U.S.App.D.C. 267, 221 F.2d 822 (1954).

10. Id at 824, of 221 F.2d.

11. 95 U.S.App.D.C. 373, 222 F.2d 398, decided March 14, 1955, and petition for rehearing en banc denied April 29, 1955.

trial, it is erroneous to try him until it has been judicially determined that he is competent to stand trial. * * *[12]

Lastly, in Blunt v. United States[13] the Court of Appeals for the District of Columbia Circuit went a step further in holding that a judicial determination, still outstanding at the time of an accused's trial and conviction, that he was incompetent to stand trial, applies equally to every step involved in his prosecution of an appeal from the conviction.[14] The particular circumstances in that case were that Blunt was in prison and without counsel from October 30, 1953, the day he was sentenced, until March 9, 1956, when the appellate court granted his motion to appeal in forma pauperis and appointed counsel for him. Although the Government argued that the appellate court had no jurisdiction to hear the matter because Blunt had abandoned his appeal by doing nothing for more than two years towards pursuing the appeal, the court concluded for reasons explained in its opinion that he had made timely efforts to pursue his appeal.[15] Said the court in a marginal footnote:

"We need not go so far as to say that any actual notice to him [that the trial court had denied his request that he be furnished a stenographic transcript at Government expense] could have had no legal effect. For present purposes, it is enough to say that until there has been a judicial determination of restored competency, one who has been judicially determined to be incompetent is—at least prima facie—legally incapable of making the choices involved in such processes as abandonment, waiver or consent. * * *"[16]

We find the foregoing federal decisions to be based upon sound reasoning and regard them as persuasive because they construe statutes identical with those of Alaska on the question here presented.[17] We conclude that the court erred in permitting Clark to be tried on October 15, 1962, without first affording him a second hearing as to his competency to stand trial.

The next question to be resolved is whether the appellant Clark will be entitled to a new trial after he has had a second hearing as to his mental competency. If at the time of such hearing it is still possible to adduce competent evidence as to his competency on October 15, 1962, and the lower court determines from the evidence that he was incompetent when he was tried and sentenced, then the court should vacate the conviction and order a new trial.[18] But even if the court finds that Clark was competent to stand trial on October 15, we are of the opinion that he should be given a new trial because of certain other prejudicial errors committed by the lower court in the trial of this case as we shall point out.

Of course, if no competent evidence is available at the second hearing bearing on the competency of Clark to stand trial on October 15, 1962, then the court will have to determine his competency to presently stand trial and proceed to retry him if he is found to be competent, otherwise to commit him until he is later determined to be mentally competent to stand trial or until the pending charges against him are disposed of according to law as required by chapter 104, SLA 1960.

We deem it sufficient for the purposes of this decision to rule upon only one of the errors charged by the appellant to have been committed during the course of

12. Id. at 401, of 222 F.2d.

13. 100 U.S.App.D.C. 266, 244 F.2d 355 (1957).

14. Id. at 361, of 244 F.2d.

15. Id. at 359–360 of 244 F.2d.

16. Id. at 360–361, n. 17 of 244 F.2d.

17. State v. Vallejos, 89 Ariz. 76, 358 P. 2d 178, 182 (1960); Martin v. American Potash & Chem. Corp., 33 Del.Ch. 234, 92 A.2d 295, 300, 35 A.L.R.2d 1140 (1952).

18. Gunther v. United States, 94 U.S.App. D.C. 243, 215 F.2d 493, 497 (1954).

the trial. We refer to the appellant's second specification that the court erred in permitting him to represent himself at the trial.[19] It is true that at the beginning of the trial the court informed Clark that if he had no funds to hire an attorney, the court would appoint one for him. Clark acknowledged the offer but stated that he desired to represent himself. Here stood a man indicted on two very serious charges, who if convicted might be made to serve the remainder of his life in prison—a man who only two and a half months before had been found to be incompetent to assist in his own defense by the same court.[20] Even the district attorney was concerned that a man in the appellant's position should be permitted to defend himself, for he remarked to the court

"I am concerned about Mr. Clark appearing without an attorney in this case, Your Honor. I wonder if he has—I believe he has been, but I would like to be sure that he has been fully advised of his rights in this matter, so that there can't be any error arising out of the fact that there is no attorney. This is a difficult defense * * *."

Then followed this short colloquy between the court and the appellant:

"THE COURT: Well, Mr. Clark, do you understand that if you don't have funds to hire an attorney that the Court can appoint one for you.

"MR. CLARK: Yes, sir. I have that knowledge, all right. I desire to represent myself—regardless.

"THE COURT: Very well, I think the record is clear."

The situation called for a penetrating and comprehensive examination by the trial judge as to whether the appellant understandingly and intelligently waived his right to counsel, but it received only perfunctory consideration which lacked the basic fairness consistent with due process.[21]

The record reveals that, without the aid of counsel, the appellant proceeded to act as his own attorney throughout the presentation of the prosecution's case, involving the testimony of twelve witnesses including an FBI specialist on explosives and a skilled handwriting analyst. He also sat alone during the presentation of the main

19. The appellant also claims that the trial court erred: (1) in refusing an offer of proof supporting the defense of insanity and in refusing to permit that defense to be interposed in the presentation of appellant's case; (2) in denying appellant's court-appointed counsel sufficient time to prepare his defense; (3) in permitting the use of an unqualified and incompetent interpreter; (4) in failing to instruct the jury to disregard testimony concerning exhibits obtained by an illegal search and seizure; (5) by informing the jurors that they might consider testimony regarding suppressed evidence obtained by an illegal search and seizure; (6) in refusing to permit appellant to substitute his own chosen counsel for court-appointed counsel; (7) in refusing to permit appellant's own chosen counsel to be associated in his defense; and (8) in unduly restricting appellant's right of cross-examination.

20. It should be noted that the judge who presided at the appellant's trial was not the same judge who had earlier found him to be incompetent to stand trial and ordered him committed for psychiatric care.

21. See Von Moltke v. Gillies, 332 U.S. 708, 723–25, 68 S.Ct. 316, 323, 92 L.Ed. 309, 320–21 (1948), wherein the Supreme Court said:
"The fact that an accused may tell him [the trial judge] that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered."

part of the defense during which time no less than fourteen persons testified. His examination and cross examination of witnesses demonstrates extreme ignorance of how this phase of a criminal case should be conducted. He took no part in examining jurors called to the jury box, and he exercised none of his peremptory challenges. He made no objection to the use by the state of an interpreter for its principal witness, Gamez, without any showing of his qualifications, and he waited until the prosecution had put in a considerable portion of its case before requesting that all witnesses be excluded from the courtroom. He objected to certain exhibits admitted into evidence for the state but presented no cogent argument in support of his objection.

In the face of circumstances such as those we have just related, it was the duty of the court, whether requested or not, to assign counsel for the appellant as a necessary requisite of due process of law under the fourteenth amendment of the federal constitution.[22] The right of an accused to have the assistance of counsel is also guaranteed by article I, section 11, of the Alaska Constitution.[23] Since the appellant was denied this right, the judgment must be reversed and a new trial ordered.

Reversed and remanded for further proceedings in conformity with this opinion.

22. Palmer v. Ashe, 342 U.S. 134, 72 S.Ct. 191, 96 L.Ed. 154 (1951); Pennsylvania ex rel. Herman v. Claudy, 350 U.S. 116, 76 S.Ct. 223, 100 L.Ed. 126 (1956); Moore v. Michigan, 355 U.S. 155, 78 S.Ct. 191, 2 L.Ed.2d 167 (1957); Annot., 2 L. Ed.2d 1644, 1651–54 (1958).

23. Article I, section 11, of the Alaska Constitution provides, in part, as follows: "In all criminal prosecutions, the accused shall * * * have the assistance of counsel for his defense."