**Joseph JAMES, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–1154.**

Court of Appeals of Alaska.

Jan. 2, 1987.

Rehearing Granted Feb. 2, 1987.

William A. Davies, Asst. Public Defender, Fairbanks, and Dana Fabe, Public Defender, Anchorage, for appellant.

Nancy R. Simel, Asst. Atty. Gen., Office of Sp. Prosecutions and Appeals, Anchorage, and Harold M. Brown, Atty. Gen., Juneau, for appellee.

## OPINION

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

COATS, Judge.

Joseph James was convicted, following a jury trial, of attempted sexual assault in the second degree, AS 11.31.100 and AS 11.41.420(a)(1), and three counts of sexual abuse of a minor in the first degree, AS 11.41.434(a)(1). James was sentenced to a composite sentence of thirty years. James appeals his conviction and sentence, raising several issues. We reverse James' conviction, finding that the record does not indicate that James knowingly and intelligently waived his right to counsel.

A description of both the pre-trial proceedings and James' actions at trial is necessary to an understanding of the waiver of counsel issue presented here. Following his arraignment, Pre-Trial Services contacted James to determine whether he qualified for a public defender. James apparently stated he would not allow a public defender to represent him. Pre-Trial Services contacted James again after learning James had failed to obtain private counsel, but James stated attorneys were a "handicap" and that he would represent himself.

Superior Court Judge Jay Hodges held a hearing on appointment of counsel on September 6, 1984. Judge Hodges told James several times at that hearing that the court would appoint James an attorney if he could not afford one, but James stated he had sufficient funds to hire his own attorney. The court also informed James his trial would begin October 22, and that he would have to have a lawyer at that time or represent himself.

At a second hearing, held on October 1, 1984, James acknowledged that he understood he would have to represent himself if he did not obtain an attorney. He affirmed, however, that he did not want a public defender appointed. The court warned James at this time that he would have to comply with the court rules even if he did not have a lawyer. James then asked the court how he could obtain witnesses' names and how to subpoena witnesses. In response, Judge Hodges appointed the public defender's office to act as James' "secretary" to handle such matters for him. The judge also reminded James that he could return to court and get appointed counsel if he desired. James responded that he felt he already had enough "handicaps."

In response to a letter from James requesting a continuance, Judge Hodges held another hearing on October 16, 1984. James contended he needed more time to prepare for trial because of crowded library conditions and because he was unfamiliar with the law. He stated that he felt he could adequately defend himself given enough time, although he would be "clumsy." When Judge Hodges reminded James he had repeatedly been offered a public defender, and warned James that the trial would proceed as scheduled, James explained that he did not want a public defender. James stated that because he could not afford out-of-state counsel or find satisfactory in-state counsel, he had decided to represent himself. James told the court:

I wasn't aware during the first couple of months that I would be representing myself, since I don't consider that, you know, the best thing if you can avoid it. And when I finally ... figured out that I wouldn't be able to obtain counsel to my satisfaction, then I realized that I had to do some study, and do some preparation.

Judge Hodges denied the continuance.

The trial began on October 23 with James representing himself. He reserved making his opening statement until after the state closed its case. James did not cross-examine three primary prosecution witnesses, including the two children he was accused of abusing. On the second day of trial, James asked for an attorney. After meeting with a public defender, James Cannon, James stated he wanted the public defender to take over full representation because "I don't know what I'm doing.... It became glaringly obvious." Cannon requested and received a continuance until the following Monday.

All prosecution witnesses remained available. Cannon reviewed cassettes of the proceedings. When the trial convened, Cannon made an opening statement and called witnesses on James' behalf. Cannon called the victims' father and re-called the victims' mother, as James had not cross-ex-

amined her when she testified previously. Finally, James also testified.

James now appeals his conviction, arguing that the trial judge should have made efforts to ensure James knew the risks and burdens involved in self-representation. James contends his constitutional right to an attorney was violated because Judge Hodges did not establish that James was making a knowing and intelligent waiver of that right before allowing James to represent himself.

Under Art. 1, sec. 21 of the Alaska Constitution and the Sixth Amendment to the United States Constitution, a criminal defendant has the right to represent himself. *Faretta v. California*, 422 U.S. 806, 821, 95 S.Ct. 2525, 2535, 45 L.Ed.2d 562 (1975); *McCracken v. State*, 518 P.2d 85, 91 (Alaska 1974). However, courts have imposed protective restrictions on the exercise of that right because it involves a waiver of the fundamental right to counsel. A defendant must knowingly and intelligently give up the benefits of the right to counsel before being allowed to represent himself. *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541. "Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation...." *Id.*

The Alaska Supreme Court requires that the trial court first establish that the defendant can represent himself in a "rational and coherent manner" and then determine whether "the prisoner understands precisely what he is giving up by declining the assistance of counsel," before allowing the defendant to appear *pro se*. *McCracken*, 518 P.2d at 91. The trial judge must explain the advantages of legal representation in "some detail." *Id.* at 92. The record must reflect a clear waiver of the right to counsel. *O'Dell v. Anchorage*, 576 P.2d 104, 108 (Alaska 1978); *Smith v. State*, 651 P.2d 1191, 1194 (Alaska App. 1982).

In addition, Alaska Rule of Criminal Procedure 39(b)(3) requires the court to ap-

point an attorney for an indigent defendant unless the defendant both proves that he understands the benefits of having an attorney and knowingly waives that right. This rule places an affirmative duty on the trial judge to determine, on the record, whether a defendant understands the benefits of legal counsel. *Gregory v. State*, 550 P.2d 374, 379 (Alaska 1976).[1]

None of the required inquiries appear on the record in this case. There is no indication in the record that the trial judge ever informed James what an attorney could do, explained the problems of defending oneself, or asked James if he understood either an attorney's function or the difficulties of self-representation. While at one point James did say he thought representing himself was not a good thing to do, this hardly demonstrates that he fully understood the risks he was undertaking. Nor was it sufficient for the trial judge to repeatedly tell James he had the right to appointed counsel.

The record does not demonstrate James understood either a lawyer's function or what it would mean to proceed without counsel. Given the severity of the charges here, James' obvious confusion about obtaining counsel, and his apparent difficulties in representing himself, both before and during trial, we believe it was incumbent on the trial judge to guarantee James understood the consequences of his actions. This required a careful explanation of what an attorney could do for James as well as an explicit inquiry on the record into whether James understood that explanation, and the risks he was undertaking. This inquiry would not have disrupted the proceedings, as Judge Hodges knew a

week before trial began that James intended to represent himself. Although we could speculate about the sophistication of James' legal knowledge, the purpose of requiring specific inquiries on the record is to avoid the need for such speculation. Absent this evidence, we must find that James did not validly waive his right to counsel.

We find that this case is distinguishable from *Kelly v. State*, 663 P.2d 967 (Alaska App.1983). In *Kelly* we found that Kelly had knowingly and intelligently waived his right to counsel in spite of the fact that the trial judge had not made the thorough inquiry mandated by *McCracken*. In *Kelly*, similarly to this case, the trial judge had merely cautioned Kelly that he would be held to the same standard of conduct and that the same rules would apply as if Kelly were an attorney. In finding that Kelly waived his right to counsel, we emphasized that the record demonstrated Kelly's "considerable experience with the criminal justice system" and that the record indicated "a strong likelihood that Kelly was aware of the advantages inhering to a criminal defendant from representation by counsel." *Id.* at 969. We emphasized that the record showed Kelly's legal sophistication. *Id.* Of particular importance in Kelly's case was the fact that throughout the trial he had an attorney aiding him as co-counsel. *Id.* at 970. We also note that the charges against Kelly were uncomplicated (issuing a bad check). *Id.* at 968.

By contrast, although James has had prior contact with the criminal justice system, the record does not indicate that he had the legal sophistication which Kelly had. The sexual assault charges, which involved

1. The Commentary to 1 ABA Standards for Criminal Justice, § 6–3.6 at 6.39–40 (2d. ed. 1982) states:

    Except in the most unusual circumstances, a trial in which one side is unrepresented by counsel is a farcical effort to ascertain guilt. Thus, once a defendant has clearly and unequivocally declared his or her intention to appear pro se, the trial judge must conduct a thorough inquiry into the circumstances surrounding the assertion.... This inquiry should be incorporated into the trial record ... and should include: advising the defend-

    ant of the right to counsel and the importance of having counsel; warning the defendant of the "dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open'"; and inquiring into the defendant's educational background, previous experience with criminal trials, and general competence.... [T]he defendant must possess the mental competence to understand the dangers and ramifications of self-representation. [Footnotes omitted.]

cross-examining young victims who were alleging sexual assault, were particularly sensitive charges for James to defend himself against. Of primary importance is the fact that James did not have representation for other than issuing subpoenas until the second day of trial. By the time counsel entered the case, significant evidence had been presented to the jury. We cannot help but believe that it was a significant handicap for counsel to enter this case in mid-trial.

The record in this case is not sufficient for us to find that James knowingly and intelligently waived his right to counsel. We therefore reverse his conviction.

REVERSED.[2]

BRYNER, C.J., concurs.

SINGLETON, J., dissents.

BRYNER, Chief Judge, concurring.

I join in the opinion written by Judge Coats. The Alaska Supreme Court, in keeping with standard 6–3.6 of the ABA Standards for Criminal Justice, has required trial courts to assure, by an on-the-record inquiry, that the accused understands the benefits of counsel and the dangers of self-representation before proceeding unrepresented to trial. *See McCracken v. State,* 518 P.2d 85, 91–92 (Alaska 1974). In my view, the present case provides a good illustration of the wisdom of this requirement.

Here, the trial court did not expressly advise James of the benefits of counsel or of the dangers of self-representation. The court apparently assumed that, because James knew what he wanted, he must have had sufficient information to make an informed choice. It is far from clear, however, that James' choice to proceed without

counsel was an informed one. The strength of James' determination to proceed unrepresented has little if anything to do with whether his determination reflected an informed choice. Many misinformed and uninformed people, mistakenly believing themselves to be adequately informed, hold strong views. Often, though certainly not always, such views can be changed by the giving of thorough and accurate advice.

In his dissent, Judge Singleton is willing to infer from James' background that James had sufficient information concerning the benefits of counsel and the dangers of self-representation. The inference is a tenuous one, at best, since it assumes James' ability to understand and appreciate the subtleties of his past representations by counsel. If James was the type of person who, as many do, paid more attention to results than to details, it is easy to see how he might have learned little from his past experience other than the fact that he had been repeatedly convicted when represented by counsel.

In stark contrast to the weak inference arising from James' background is the record of his performance at trial in the present case. James was incapable of managing even the most rudimentary functions of self-representation. He did nothing in his own defense, until, halfway through the trial, "it became glaringly obvious" to him that, as he put it, "I don't know what I'm doing." Thus the record of what actually happened at trial convincingly establishes that James did not really understand either what he was giving up or what he was undertaking when he decided to proceed to trial *pro se.*[1] Under the circumstances, I cannot readily assume that thorough and accurate advice concerning the benefits of

---

**2.** Because James' conviction is reversed, we find it unnecessary to review his sentence.

**1.** There is no suggestion whatsoever in the record that James was dissembling when he represented to the court, midway through trial, that he was unable to assist himself. Nor is there anything to suggest that James was attempting to use his *pro se* status as a means of manipulating the proceedings in order to obtain

a mistrial. Obviously, an entirely different question would be presented if this were the case. It is worth noting, in any event, that express, on-the-record advice concerning the benefits of counsel and the dangers of self-representation would ultimately provide the best protection against any such manipulative tactics.

counsel and the dangers of self-representation would have gone unheeded.

SINGLETON, Judge, dissenting.

The majority reverses James' conviction, finding that the record does not indicate that James knowingly and intelligently waived his right to counsel. The court recognizes that James was personally addressed by the trial court on a number of occasions and James purported to waive his right to counsel and, elected to proceed *pro se*. However, the majority finds the waiver ineffective because it concludes that the trial court neither apprised James of, nor elicited his understanding of an attorney's function and the difficulties of self-representation. It appears that the majority views the trial court's failure to expressly address James regarding these matters as prejudicial error, *per se*, precluding any necessity to consider the totality of the circumstances, or evaluate the facts under a harmless-error test.[1] *Compare McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969) (adopting a similar *per se* rule of reversal for noncompliance with Federal Rule of Criminal Pro-

---

1. The majority fails to distinguish between three related, but distinct, situations: (1) where the defendant waives counsel and simultaneously pleads guilty; (2) where the defendant pleads not guilty but at the outset elects to represent himself and (3) where the defendant is not represented by counsel at arraignment but refuses court-appointed counsel and represents that he will thereafter retain counsel, but fails to do so. The first two situations present no calendaring problem since the defendant's intentions are clear from the outset. It is the third situation which is presented in this case and which poses substantive problems of calendar control, since a defendant may simply procrastinate in obtaining counsel until the last minute in order to force a continuance. A related problem exists when defendant seeks replacement of appointed counsel on the eve of trial. *See* 2 W.R. LaFave and J.H. Israel, *Criminal Procedure* § 11.4(b) at 36–37 (1984). It is to preclude a defendant from manipulating the trial calendar in this way that most courts apply a forfeiture rule, rather than a waiver rule, to the third situation. Where a defendant informs the court at arraignment that he has not obtained counsel but will do so shortly, and the court informs him of the trial date and that he will have to represent himself if he has not obtained counsel, prepared for trial at that time, failure to obtain counsel will result in a forfeiture of the right to counsel without any particular inquiry into the defendant's understanding of the benefits and detriments of self-representation. *Id.* § 11.3(c) at 33–34.

In order to avoid disruption in the calendaring of cases and comply with the holding in this case, it will be necessary for the trial court to question any defendant who appears unrepresented at his arraignment, including those who express an interest in retaining counsel, to ensure that the defendant understands the benefits of counsel. The authors of a leading treatise suggest:

Appellate opinions have suggested that the defendant should be informed at least as to the following matters: (1) that presenting a defense is not a simple matter of telling one's story, but requires adherence to various technical rules governing the conduct of a trial; (2) that a lawyer has substantial experience and training in trial procedure and that the prosecution will be represented by an experienced attorney; (3) that a person unfamiliar with legal procedures may allow the prosecutor an advantage by failing to make objections to inadmissible evidence, may not make effective use of such rights as the voir dire of jurors, and may make tactical decisions that produce unintended consequences; (4) that a defendant proceeding pro se will not be allowed to complain on appeal about the competency of his representation; and (5) that the effectiveness of his defense may well be diminished by his dual role as attorney and accused.

If the defendant persists in his request to proceed pro se, notwithstanding the court's warning as to the possible disadvantages of self-representation, then the preferred procedure directs the court to ascertain that the defendant understands and appreciates those disadvantages and their possible consequences. This requires, appellate courts note, a penetrating and comprehensive inquiry, including an interchange with the defendant that produces more than passive yes and no responses. The trial court should explore the primary factors that might have a bearing on defendant's ability to comprehend, including age, education, social background, mental health history, prior experience or familiarity with criminal trials, and prior consultation with counsel in deciding to proceed pro se. This process of explanation and inquiry will not only assist the trial court in making an accurate assessment of defendant's waiver, but provide the appellate court with an objective basis for review upon the almost inevitable challenge to the waiver by the defendant who proceeds pro se and is subsequently convicted.

*Id.* § 11.5(c) at 45–46 (footnotes omitted).

cedure 11) *with Lewis v. State,* 565 P.2d 846 (Alaska 1977) (rejecting such a rule).

Since I am aware of no authority supporting the court's decision in this regard and I view our supreme court's decision in *Lewis* as strongly counseling against such a rule, I dissent. In my view, whether a defendant has knowingly, intelligently, and voluntarily waived his right to counsel is a question of fact to be determined in light of the totality of the circumstances. *See Maynard v. Meachum,* 545 F.2d 273, 277–79 (1st Cir.1976). James has sat through a felony jury trial. *See James v. State,* 567 P.2d 298 (Alaska 1977). Additionally, with the advice of counsel, James pled guilty to offenses similar to those for which he was indicted in this case. Finally, this conviction marks his fourth felony conviction. I would, therefore, conclude that he has sufficient knowledge of what lawyers do to enable him to waive counsel.

In determining whether a waiver of the right to counsel finds support in the record, it is necessary to differentiate between the inquiry demanded by the constitution and certain additional safeguards added by court rule or supervisory opinion. For example, in the constitutional sense, a waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. *See Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). Thus at a minimum, the defendant must be found to be competent, though competence to waive constitutional rights is equated with competence to stand trial. *See Dolchok v. State,* 639 P.2d 277, 293–94 (Alaska 1982); *Morgan v. State,* 582 P.2d 1017, 1021 n. 11 (Alaska 1978). The defendant must also be informed of his right to counsel and further informed that if he cannot afford counsel, counsel will be appointed to represent him. Alaska R.Crim.P. 5.1(a); 39(a). Finally, the defendant must be given a reasonable opportunity to retain counsel if he wishes to do so.

In this case, it appears clear that James was informed of his right to counsel, and the right to the appointment of counsel if he could not afford counsel, and was given a reasonable time to retain counsel. More significantly, he was clearly and unequivocally informed that if he had not retained counsel by the time set for trial he would be required to represent himself.[2] James acknowledged these rights on the record and indicated that he was prepared to act in conformity with the court's directions.

I do not understand the majority to question these facts, nor to question James' competency under *Dolchok* and *Morgan* to waive constitutional rights. In fact, James has never denied competence. James' presentence examination by a psychiatrist and a psychologist did not question his competence. Finally, there is no suggestion that James' actions were in any sense involuntary, *i.e.,* coerced or the result of duress. It appears beyond doubt that a court may require a defendant to elect between representation by counsel and self-representation within a reasonable time, and make self-representation the default choice without rendering the choice involuntary. *See McKee v. Harris,* 649 F.2d 927, 931 (2nd Cir.1981), *cert. denied,* 456 U.S. 917, 102 S.Ct. 1773, 72 L.Ed.2d 177 (1982).

James does not contend that he was given an insufficient time to retain counsel, nor does he contend that he was indigent and therefore unable to retain counsel. In fact, he repeatedly informed the trial court, on the record, that he had the funds necessary to retain counsel. Under these circumstances, the constitutional requirements of *Johnson v. Zerbst* have been met on the record, and the trial court's implicit finding that James knowingly, intelligently, and voluntarily waived counsel would appear beyond dispute. *See Morgan v. State,* 582 P.2d at 1024–28 (supreme court evaluates record and determines that error in failing to comply with mandatory provisions of Criminal Rule 11(c) did not invali-

---

**2.** Most courts apply a forfeiture standard to this type of case because they find defendant's failure to retain counsel or make a timely request for appropriate counsel inherently "manipulative." *See* n. 1, *supra.*

date plea and accompanying waiver of rights).

The dispute in this case turns on the impact of Criminal Rule 39(a) and (b). Criminal Rule 39(a) provides that if a defendant appears for arraignment or trial without counsel, the court shall advise him of his right to have counsel and shall ask him if he desires the aid of counsel. It is undisputed that this was done. The difficulty in this case turns on Criminal Rule 39(b)(3) which provides further that:

In the absence of a request by a [indigent] defendant, otherwise entitled to appointment of counsel, the court shall appoint counsel for him unless he demonstrates that he understands the benefits of counsel and knowingly waives the same.

Rule 39(b) does not expressly apply to James since he has never been determined to be indigent and, in fact, denied indigency on a number of occasions. Nevertheless, in *Swensen v. Anchorage*, 616 P.2d 874 (Alaska 1980), the supreme court held that Criminal Rule 39(a) must be interpreted consistently with Criminal Rule 39(b)(3) in order to avoid constitutional problems; *i.e.*, the advice given to a nonindigent defendant concerning the right to counsel must also include at least a brief explanation of the "benefits of counsel." *Id.* at 877.

In summary, the Alaska Supreme Court has gone beyond the requisites of *Johnson v. Zerbst* in a number of cases to require that a trial court make some inquiry of a defendant before accepting a waiver of counsel to determine that he, in fact, understands the responsibility he is undertaking. *See, e.g., Williams v. State*, 616 P.2d 881, 883 (Alaska 1980); *Swensen v. Anchorage*, 616 P.2d 874, 877 (Alaska 1980); *Ledbetter v. State*, 581 P.2d 1129, 1131 (Alaska 1978); *O'Dell v. Anchorage*, 576 P.2d 104, 108 (Alaska 1978); *Else v. State*, 555 P.2d 1210, 1211–12 (Alaska 1976); *Gregory v. State*, 550 P.2d 374, 379 (Alaska 1976); *McCracken v. State*, 518 P.2d 85, 91–92 (Alaska 1974); *Clark v. State*, 388 P.2d 816, 822 (Alaska 1964). This court has followed those decisions. *See Petranovich v. State*,

709 P.2d 867 (Alaska App.1985); *Kelly v. State*, 663 P.2d 967 (Alaska App.1983); *Smith v. State*, 651 P.2d 1191, 1194–95 (Alaska App.1982). These cases follow the lead suggested by the plurality opinion in *Von Moltke v. Gillies*, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309 (1948) (Black, J., plurality). It is important, however, to stress that the inquiry suggested by Justice Black, and incorporated into the I ABA Standards for Criminal Justice § 5–7.2 —.7.3 and § 6–3.6 (2d. ed. 1982), and codified in the Uniform Rules of Criminal Procedure, Rule 711, 10 U.L.A. 307–08 (1974), is not constitutionally mandated. *See, e.g.*, 2 W.R. LaFave and J.H. Israel, *Criminal Procedure* § 11.3(b), at 30–33 (1984). As LaFave and Israel point out, the critical issue, is what the defendant understood— not what the court said. *Id.* at 32.

Consequently, the absence of explicit inquiries during the discussion of the defendant's intentions regarding retaining counsel and about the advantages of counsel and the burdens of self-representation should not compel a conclusion that the defendant's waiver of counsel was ineffective. *Maynard v. Meachum*, 545 F.2d at 277–79. An argument could be made for the proposition that the determination of whether James understood "the benefits of counsel" at the time he initially determined to proceed to trial *pro se*, should be made by the trial court after an evidentiary hearing. *See, e.g., Boyd v. Dutton*, 405 U.S. 1, 92 S.Ct. 759, 30 L.Ed.2d 755 (1972) (*per curiam*); *Maynard v. Meachum*, 545 F.2d at 278. A remand for such a hearing would certainly be preferable to an outright reversal.

After reviewing the record, I am satisfied, however, that James did knowingly, intelligently, and voluntarily waive his right to counsel and, more particularly, that he understood the burdens that he was undertaking by so doing. *See Else v. State*, 555 P.2d at 1211–12 (reaching similar conclusions on a comparable record). In any event, I am satisfied that a failure to conduct the colloquy required by the majority was harmless beyond reasonable

doubt. *See Richardson v. Lucas,* 741 F.2d 753, 757 (5th Cir.1984).

It is important to bear in mind that no one questions James' competency to waive constitutional rights, *cf. Clark v. State,* 388 P.2d at 822, nor contends that he is unfamiliar with the English language, *Gregory v. State,* 550 P.2d at 378–79, nor is it contended that he was led to believe that trial would be postponed if he had not obtained counsel by the time set for trial, *Ledbetter v. State,* 581 P.2d at 1131. Finally, this case is unlike *Von Moltke v. Gillies,* where the defendant waived counsel and simultaneously entered a plea of guilty, raising a substantial question as to her understanding of the charges, possible defenses to those charges, and innocence in fact. *Compare Williams, Swensen, Else,* and *Gregory.*

In determining James' familiarity with lawyers and what they do, it is impossible, in my view, to overlook James' extensive exposure to the criminal justice system. In so many of the cases relied upon by the majority, the defendant was accused of a relatively minor misdemeanor and apparently had no prior exposure to the criminal justice system. Such a defendant might well fail to understand the seriousness of his predicament and the need for help. In the cases where a defendant was familiar with the system and failed to obtain substitute counsel within a reasonable time or expressed an interest in self-representation, the supreme court has found effective waiver. *Gottschalk v. State,* 602 P.2d 448 (Alaska 1979), *cert. denied,* 447 U.S. 920, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980); *Else v. State,* 555 P.2d at 1211–12. And so have we. *See Kelly v. State,* 663 P.2d 967 (Alaska App.1983).

James was born on June 25, 1945. He first came to the attention of juvenile authorities at the age of fifteen when he was committed to the McClaren School for Boys in Woodburg, Oregon (a State of Oregon reform school). He remained there until age seventeen, and periodically returned over the next several months. James eventually joined the Army on February 18, 1964. While in the Army, he was the subject of a general court martial but was honorably discharged on February 18, 1966. On October 21, 1967, he was arrested for his first felony, uttering and publishing a forged bank check. He apparently received a five-year suspended sentence on February 9, 1968. His probation was revoked on May 21, 1968, and he was committed to the Oregon State Prison for three years. He served the entire sentence, less good time, and was released in April 1970. During 1971, he served two jail sentences for traffic offenses. In September 1973, James broke out the windows in four stores along Front Street in Ketchikan and was sentenced by the district court to serve 365 days in the Ketchikan City Jail. He "flat-timed" that sentence after ten months at the Southeastern Regional Correctional Institution at Lemon Creek. It appears that James was in trouble again shortly after being released from jail. In September 1974, he was arrested in Ketchikan for sale of marijuana. *See, e.g., James v. State,* 567 P.2d 298 (Alaska 1977). He was convicted after a jury trial and received a two-year suspended sentence. This was James' second-felony offense. More significant is James' third-felony conviction. On September 11, 1979, James pled *nolo contendere,* apparently with the advice of counsel, to a charge substantially similar to the charges for which he was convicted in this case, *i.e.,* sexual contact with the breast and vagina of S.J., an eleven-year-old female, in violation of former AS 11.15.-134(a) (a second count charging James with the sexual penetration of the same child, in violation of former AS 11.15.120(a)(2), was dismissed without prejudice in exchange for the no contest plea on count I).

From the foregoing, it is reasonable to infer that James has had substantial exposure to lawyers over the past fifteen years and should be reasonably acquainted with the functions they perform. Most significantly, in September 1979, just five years prior to committing the offenses in this case, James entered a counseled plea to a similar offense, presumably after being fully advised of his legal rights. Under these

circumstances, it is unreasonable to assume that James was unaware of the benefits of counsel and the burdens of self-representation.[3]

## CONCLUSION

It is possible that this court's decision requires nothing more than the utterance of certain magic words during pretrial proceedings, and adopts a rule requiring automatic reversal if the magic words are not uttered. If so, the trial courts should have little difficulty preparing an appropriate checklist and following it. Aid in formulating a checklist can be found in the magistrate's manual. *See also Swensen,* 616 P.2d at 878 n. 5; the ABA Standards § 5–7.2––7.3 and § 6–3.6; and Uniform Rule of Criminal Procedure 711. It is clear, on this record at least, that James would have said, "Yes" if asked if he knew what lawyers did, *see Williams,* 616 P.2d at 803, and would not have been persuaded to accept a public defender by being read the litany in the magistrate's manual. The record is clear that James would not willingly accept the public defender until he observed his defense in shambles at the conclusion of the prosecutor's case, at which point the majority apparently concludes that the trial court had no discretion but to grant a mistrial to enable the public defender to start from scratch.

It is possible, particularly in light of Chief Judge Bryner's concurrence, that the

majority really sees some substantive significance behind the magic words which it requires beyond the possibility of persuading a defendant to accept a lawyer's aid. The majority may be telling trial courts not to permit *pro se* representation unless the trial judge believes that the defendant will do a good job. If so, the majority is encouraging trial judges to commit automatic error. *McCracken* makes it clear that the inquiry is intended to ensure that the defendant really wants to represent himself. *See also Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). If a defendant is competent to stand trial, he is competent to waive constitutional rights. *Morgan,* 582 P.2d at 1021 n. 11. Such a person may be psychotic or he may have borderline intelligence. *See, e.g., Schade v. State,* 512 P.2d 907, 912–14 (Alaska 1973). Nevertheless, if he wishes to represent himself, he must be permitted to do so.

In summary, the litany required by the majority is permissible to assure the trial court that the defendant knows what he is doing, it is not a means for preparing a record which will justify denying a defendant the right to proceed *pro se* or justify the court in foisting unwanted counsel on an objecting defendant. If a defendant is competent, the decision whether to accept appointed counsel or proceed *pro se* is his, not the court's, no matter how big a mistake the court believes the defendant to be making.[4] If the court violates the right of

---

**3.** James exhibited an awareness of the seriousness of the position and the problems of self-representation on a number of occasions. James sought a continuance in order to have more time in the prison law library and when he mentioned problems he was having regarding his case, he was furnished secretarial service by the Public Defender Agency, which arranged to subpoena the witnesses James wished to call. James nevertheless continued to reject counsel until the completion of the state's case-in-chief, at which time it became clear to James that he had a fool for a client, at which point he asked for, and was immediately furnished, counsel. These factors strengthen the inference that James was aware of the difficulties of self-representation at various stages of his prosecution but, nevertheless, continued to reject appointment of the public defender and voluntarily encountered them. It was only at mid-trial that

James was willing to accept the public defender. To require a mistrial under these circumstances will cause havoc to the criminal trial calendar.

**4.** *Annas v. State,* 726 P.2d 552 (Alaska App. 1986), is not to the contrary. Annas conceded that he was incapable of representing himself and sought lay representation. The trial court relied in part on a psychiatrist's testimony drawing a distinction between Annas' competence to stand trial and his competence to waive counsel. It must be recognized, however, that the supreme court rejected that distinction in *Morgan, Dolchok,* and, by implication, *Schade.* Consequently, if Annas, despite his limitations and the trial court's vigorous advice to the contrary, had demanded the right to "go it alone," the trial court probably would have been required to allow him to do so. Annas did not wish to

self-representation, the remedy is an automatic new trial, no showing of prejudice is necessary. *See* Annotation, *Accused's Right To Represent Himself In State Criminal Proceeding—Modern State Cases,* 98 A.L.R.3rd 13 (1980).

I would affirm the judgment of the superior court.

represent himself, however, and limited his request to "lay" counsel which we held the trial court properly refused.