NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.us*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| CARRY EUGENE SHORTHILL, | Court of Appeals No. A-11078 |
| Appellant, | Trial Court No. 3AN-05-9029 CR |
| v. | |
| | O P I N I O N |
| STATE OF ALASKA, | |
| Appellee. | No. 2462 — July 10, 2015 |

Appeal from the Superior Court, Third Judicial District, Anchorage, Larry D. Card, Philip R. Volland, and Michael L. Wolverton, Judges.

Appearances: Hannah King (opening brief) and Sharon Barr (reply brief), Assistant Public Defenders, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant. Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for the Appellee.

Before: Mannheimer, Chief Judge, Allard, Judge, and Hanley, District Court Judge.[*]

Judge MANNHEIMER.

---

[*]  Sitting by assignment made pursuant to Article IV, Section 16 of the Alaska Constitution and Administrative Rule 24(d).

In September 2005, Carry Eugene Shorthill led the Anchorage police on a strange, low-speed car chase on the Glenn Highway. Based on this incident, Shorthill was convicted of felony eluding and third-degree assault (for placing one of the pursuing officers in fear of imminent serious physical injury).

In this appeal, Shorthill argues that the superior court committed error by refusing to allow him to represent himself at trial, after Shorthill had represented himself during a year of pre-trial litigation. Shorthill also argues that he was brought to trial outside the time limits of Alaska's speedy trial rule. And he contends that the evidence presented at his trial was legally insufficient to support his convictions.

In addition, Shorthill asserts that the superior court should have granted his motion to dismiss the indictment, and the court committed error during the trial by allowing the State to introduce evidence that Shorthill had a semi-automatic rifle in his vehicle during the pursuit.

For the reasons explained in this opinion, we conclude that the superior court properly found, based on Shorthill's efforts to represent himself during the year of pre-trial litigation, that it would be unjust and fundamentally unfair to allow Shorthill to represent himself at trial.

We also conclude that Shorthill was brought to trial within the time limits of the speedy trial rule, that the evidence at Shorthill's trial was sufficient to support his convictions, that the superior court properly denied Shorthill's motion to dismiss the indictment, and that the court properly admitted the evidence of the semi-automatic rifle in Shorthill's vehicle.

Accordingly, we affirm Shorthill's convictions.

*Underlying facts*

This case arose from the events that unfolded after Officer James Conley, driving an unmarked police car, observed Shorthill traveling at a speed of 77 miles per hour (*i.e.*, traveling over the speed limit) on the Glenn Highway near Eklutna. Shorthill was headed south, toward Anchorage.

When Conley activated his police lights and signaled to Shorthill to pull over, Shorthill slowed his vehicle and activated his right-turn signal, as if to pull off the highway at the Eklutna exit. But Shorthill did not pull over. Instead, he continued driving toward Anchorage at slower speeds, sometimes as little as 25 or 30 miles per hour. In the meantime, Shorthill's wife (who was riding in the passenger seat of the truck) activated a video camera and started recording the episode.

While he was driving, Shorthill used a mobile phone to call 911. He told the 911 operator that an unmarked police car was following him, and he directed the 911 operator to tell the officer to "back off" — that he would pull over as soon as he got to a "public place".

Officer Conley, for his part, called for backup. Two other officers — Roger Nelson and Richard Dykstra — responded.

Officer Nelson twice tried to force Shorthill to pull over. At the Mirror Lake exit, Nelson pulled in front of Shorthill and then applied his brakes, trying to force Shorthill to pull over and take the exit, but Shorthill was able to drive around Nelson's car.

Nelson next tried to stop Shorthill by deploying spike strips (tire deflation devices) on the road, but Shorthill was able to drive around these devices without puncturing his tires.

After the police engaged in these unsuccessful attempts to force Shorthill to stop, Shorthill increased his speed to around 50 or 60 miles per hour.

Along this stretch of the Glenn Highway, the road is two lanes in each direction, with a dirt median separating the traffic headed north and south. When Officer Conley started to pull alongside Shorthill in the left lane, Shorthill swerved to the left and began driving down the center of the road, straddling the two lanes and forcing Conley to stay behind him. When Shorthill moved further over to the left, into the left lane, Conley overtook him on the right, so that he could deploy more spike strips. But there was an on-ramp that entered the highway at this location, and Shorthill veered his truck sharply to the right, into the extra lane that was temporarily created by the empty on-ramp.

At this point, Conley and Shorthill were driving side-by-side. But the extra lane created by the on-ramp soon ran out, and Shorthill guided his car back into the regular right-hand lane of the highway. This forced Conley to steer his vehicle to the left to avoid an impact. For this maneuver, Shorthill was later charged with third-degree assault.

Shorthill eventually exited the Glenn Highway at the South Peters Creek exit. The officers followed Shorthill off the highway. Shorthill ran through two stop signs before he brought his truck to a stop in the parking lot of a gas station. As soon as Shorthill stopped his truck, he and his wife began honking the horn and screaming for help from inside the truck.

In order to get Shorthill out of the truck, the officers were forced to break the truck's windows. In the process of pulling Shorthill from the truck, Officer Dykstra saw an SKS (*i.e.*, a semi-automatic rifle) lying in the cab of the truck. [1] Dykstra

---

[1] The initials "SKS" stand for Samozaryadniy Karabin sistemy Simonova (in the

(continued...)

immediately yelled, "Rifle!" In response to this warning, Officer Conley pulled Shorthill's wife from the truck as well, to prevent her from having access to the rifle.

Based on this incident, Shorthill was indicted on one count of third-degree assault and one count of first-degree (felony) eluding. (Shorthill was also charged with two misdemeanors: reckless driving and resisting arrest.)

### *Shorthill's claim that he should have been allowed to represent himself at his trial*

In *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the United States Supreme Court held that defendants in criminal cases have a constitutional right to reject the assistance of counsel and to represent themselves. But more recently, in *Indiana v. Edwards*, 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008), the Supreme Court concluded that trial courts have the authority to restrict this right of self-representation in certain instances — situations where defendants "are not competent to conduct trial proceedings by themselves." *Id.*, 554 U.S. at 178, 128 S.Ct. at 2388.

In Shorthill's case, he was initially represented by counsel — in fact, by a series of attorneys — during the first year of the proceedings. This changed in November 2006, when Shorthill announced that he no longer wished to be represented by the Public Defender Agency (his then-current attorney), and that he intended to represent himself. At that time, the superior court found that Shorthill was competent to represent himself, so the court released the Public Defender Agency from further service,

---

[1] (...continued)

Cyrillic alphabet: Самозарядный карабин системы Симонова). The literal translation is: "Self-loading Carbine of the Simonov system".

*See* http://en.wikipedia.org/wiki/SKS.

and Shorthill represented himself for the next year of the proceedings (up to the time scheduled for his trial).

During this year when Shorthill had no attorney, it gradually became clear to the superior court judges handling his case — primarily, Judges Larry D. Card and Michael L. Wolverton — that Shorthill faced major difficulties in representing himself.

As we are about to describe in more detail, Shorthill kept trying to relitigate issues that he had already litigated and lost. When he was not doing that, Shorthill focused much of his attention on issues that were either legally insupportable or irrelevant — issues such as whether the police filled out the correct forms following Shorthill's arrest; or whether the officer who applied for the search warrant in Shorthill's case relied on hearsay from the officers who were personally involved in the pursuit and the traffic stop; or whether Judge Wolverton's oath of office was on file, and whether the judge was bonded.

And when Judge Card held a multi-day evidentiary hearing on Shorthill's pre-trial motion to suppress evidence (based on the purported illegality of the traffic stop), Shorthill floundered: he was unable to figure out the rules for questioning witnesses, he was unable to focus his questions on the legal issues that were relevant to his theory of suppression, and he was unable to refrain from phrasing his questions in the form of testimony (a practice that drew repeated objections from the prosecutor — objections that were sustained by the judge).

When Shorthill's case was ultimately called for trial in December 2007, Shorthill informed the court that he had communicated with an Oklahoma lawyer about assisting him at trial in an advisory capacity. But when the superior court telephoned this Oklahoma lawyer, the lawyer stated that he was not licensed in Alaska and could not represent anyone in Alaska — although he fully agreed that Shorthill needed the assistance of a lawyer.

At this point, the superior court revoked Shorthill's permission to represent himself, and the court appointed a lawyer to represent him. Shorthill now challenges this decision, arguing that the superior court violated his right of self-representation.

To answer Shorthill's claim, we are about to present a lengthy description of the litigation history of Shorthill's case. We have two purposes for presenting such a detailed factual description.

First, of course, we wish to explain why we are upholding the superior court's decision in Shorthill's case.

But second (and just as importantly), we want to make sure that our decision in this case is not interpreted as a license for trial judges to override a defendant's right of self-representation merely because a defendant is unfamiliar with court procedures, or has some difficulty understanding the pertinent rules, or advances unusual legal theories, or because it would generally be more convenient for the court if the defendant had a lawyer.

Here, the record demonstrates that Shorthill had persistent and pervasive difficulties with the judicial process — difficulties so acute that, in the words of the United States Supreme Court in *Indiana v. Edwards*, he was "unable to carry out the basic tasks needed to present his own defense without the help of counsel." [2] Shorthill was unable to organize his defense, he was unable to focus on meaningful motions or relevant points of law, and his questioning of witnesses and his arguments to the court were largely ineffectual. For this reason, we conclude that the superior court could properly decide to require Shorthill to have a lawyer.

---

[2] 554 U.S. 164, 175-76; 128 S.Ct. 2379, 2386; 171 L.Ed.2d 345 (2008).

*(a) A detailed examination of the litigation of Shorthill's case*

*Introductory note*:  We wish to clarify at the outset that, in the discussion that follows, we are *not* following the judicial convention of saying "Shorthill argued" or "Shorthill requested" when we really mean that his attorney made the argument or the request.  Instead, whenever we refer to Shorthill's having done something, we mean that he personally did it.

Shorthill's initial appearance in court took place on September 27, 2005. Shorthill was verbally combative with the judge, and he gave an account of the incident that differed substantially from the State's view.  In particular, Shorthill told the district court judge that he called 911 during the police pursuit "to ask for their assistance to protect me from this maniac that tried to run into my vehicle."

Shorthill also voiced some legal theories that were unconventional:  he suggested that it was a violation of the double jeopardy clause for the court to require both monetary bail and a third-party custodian, and he repeatedly challenged the legality of the charging documents in his case because these documents were not sworn to by someone with first-hand knowledge of the incident.  Although these theories were unorthodox, Shorthill articulated them in a clear, understandable manner.

Shorthill also told the judge that he would be able to afford his own attorney, and that he did not want a court-appointed attorney.

By early October, Shorthill had retained the services of an attorney.  But several weeks later, Judge Michael Wolverton granted this attorney's motion to withdraw.  Judge Wolverton then questioned Shorthill regarding his potential desire to represent himself.  But Shorthill told the judge that he did *not* wish to represent himself — that he was, in fact, unable to represent himself.

Judge Wolverton suggested that Shorthill might wish to apply for court-appointed counsel, but Shorthill told the judge that he would not accept a court-appointed attorney unless the attorney was willing to "sign a contract" with him — apparently, a special contract that Shorthill had prepared. Judge Wolverton informed Shorthill that a court-appointed attorney would not do that — to which Shorthill replied, "Okay. Then I don't want one."

One week later, on November 23, 2005, Shorthill returned to court to report that he had not been able to find an attorney who was willing to represent him.

Judge Wolverton again offered Shorthill a court-appointed attorney, to which Shorthill replied, "If the court-appointed counsel will sign my contract, I have no problem." The judge again informed Shorthill that a court-appointed attorney would not be required to sign his contract. The judge then offered Shorthill more time to see if he could find a private attorney who was willing to sign his contract. In response, Shorthill posed an unrelated question to the judge: Was he entitled to trial by a jury of his peers? Judge Wolverton said yes. Shorthill then announced that he was not a citizen of the United States, and that he was present before the court "only by force of arms". The judge told Shorthill that this made no difference: he was still under the jurisdiction of the court.

After this discussion, Shorthill announced that he did not want any more time to try to find a private attorney. Judge Wolverton replied that, if that was the case, he was appointing the Public Defender Agency to represent Shorthill. Shorthill responded, "Only upon signing of the contract, sir." To which the judge replied, "No, that's not going to happen. The Public Defender Agency is appointed."

At the next two hearings in this case, both held in mid-December 2005, Shorthill was represented by an assistant public defender. At the second of these hearings, Shorthill again declared that he was under the superior court's jurisdiction only

"under threat of arms". Judge Wolverton declared that Shorthill was properly under the court's jurisdiction, and that he did not intend to discuss this matter any further.

In mid-January 2006, Judge Wolverton held another hearing in Shorthill's case. At this hearing, Shorthill had a new attorney (still at public expense), and Shorthill had apparently been granted co-counsel status. When the judge called Shorthill's case and directed Shorthill and his attorney to come forward to the counsel table, the following colloquy ensued:

> *Shorthill*: Sir, that man [apparently referring to a police officer in the courtroom] is in uniform.

> *The Court*: I ...

> *Shorthill*: And he's ...

> *The Court*: If you don't come ...

> *Shorthill*: ... it's a show of force, and you're ...

> *The Court*: ... I'm going to have you ...

> *Shorthill*: ... rushing me to judgment.

> *The Court*: I'll have you arrested if you don't come to counsel table. Do you want that?

> *Shorthill*: Under force and threat of arms, sir.

> *The Court*: Yep. You bet it is.

> *Shorthill*: I — that's right: under threat of arms.

> *The Court*: That's exactly what it is. Have a seat.

The parties then proceeded to discuss Shorthill's request for discovery from a third party: the Municipality of Anchorage. Shorthill had filed a *pro se* motion seeking the personnel files of the officers involved in this incident, as well as policy and procedures manuals and police tactical manuals. Attorneys for the Municipality and for the police officers appeared in court to oppose this request. The judge and Shorthill's attorney were discussing whether the Municipal Attorney's Office had standing to oppose Shorthill's request. Then Shorthill went off on a tangent:

> *The Court*: [referring to the discovery request] So I'm not going to decide anything this morning, because I'm going to give [Shorthill and his attorney] a chance to respond [to the Municipality's argument], as [they are] entitled to. But in writing.

> *Shorthill*: Well, could I speak, sir?

> *The Court*: Yeah. Go ahead.

> *Shorthill*: Okay. This officer's presence ... is scaring the hell out of my wife, as she was assaulted sexually by an officer. [Shorthill was perhaps referring to the search of his wife's person for weapons at the scene of the traffic stop.] And he should not be here, sir.

> *The Court*: Okay.

> *Shorthill*: He's using force on us, and that is wrong. ... This is a ... neutral ground, sir.

> *The Court*: And I'm going to state, for the record, that [that] is simply, unequivocally untrue. ... He's not using any force. He has a right to wear his uniform in court. It happens every single day in this courthouse, and it will in this courtroom.

2462

*Shorthill*: Sir, ...

*The Court*: And that's all there is to it.

*Shorthill*: May I speak?

*The Court*: Briefly.

*Shorthill*: ... The first level of force is [the] officer's uniform and presence, sir. That's their use-of-force continuum that I've requested [in my discovery request], that they're trying to get out of.

*The Court*: Right.

*Shorthill*: And that stands as they are trained to use that, sir.

*The Court*: I've made my [ruling], and I'm not going to hear about this further. The officers [can] come into this courthouse with their uniforms on. They're entitled to do that, and that's all there is to it. ... There's no use of force in this courtroom. All right.

*Shorthill's wife*: So you mean ... I have to put up ...

*The Court*: Ma'am, have a seat and ...

*Shorthill's wife*: ... with the man ...

*The Court*: Have a seat.

*Shorthill's wife*: ... with an officer ...

*The Court*: Right now.

*Shorthill's wife*: ... that sexually assaulted me?

*The Court*: Have a seat. Have a seat. All right.

Later, in April 2006, a different assistant public defender began representing Shorthill. By mid-May, Judge Wolverton had conducted an *in camera* review of the municipal records and documents that Shorthill was requesting, and the judge issued an order directing the Municipality to produce some (but not all) of these requested materials.

Two months later, at a mid-July hearing, Shorthill complained that Judge Wolverton had not directed the Municipality to release all of the materials he requested. The judge explained to Shorthill that he had gone through all the materials *in camera*, and that he had made his decision — a decision that gave Shorthill more than the Municipality and the police wanted, but less than everything Shorthill wanted.

In response to the judge's explanation, Shorthill began to argue that the court had already issued an order the previous December that required complete production of everything Shorthill wanted. The judge replied, "I've given you what I'm going to give you. That's all there is to it."

(As we will explain in a later section of this opinion, Judge Wolverton had in fact issued an order in December 2005 that purported to completely grant Shorthill's discovery request. But then the Municipality and the police officers objected to the breadth of the discovery — prompting Judge Wolverton to conduct an *in camera* review of the requested materials and, ultimately, to scale back the scope of the disclosure. In the ensuing months, Shorthill repeatedly argued that Judge Wolverton's original order continued to govern the discovery question — and both Judge Wolverton and Judge Card repeatedly informed Shorthill that Judge Wolverton's *later* decision — the decision

he made following his *in camera* review of the materials — was the controlling decision.)

Two months later, at a hearing in mid-September 2006, Shorthill objected to any further participation by his assistant public defender. He told the court that he had "fired [his attorney] in open court several times." Shorthill complained that his assistant public defender had "failed to produce any documentation" and had "failed to communicate with me", and had "filed some silly documents without any authority to do so — like practicing medicine without a license."

Two weeks later, in early October, the Public Defender Agency asked the superior court to hold an *in camera* representation hearing.

Ultimately, on November 13, 2006, Judge Larry Card allowed the Public Defender Agency to withdraw and allowed Shorthill to begin representing himself — after the judge found that Shorthill was competent to do so, and that he had knowingly waived his right to counsel.

The next court proceedings of note in Shorthill's case occurred in August 2007, when Judge Card began a multi-day evidentiary hearing on Shorthill's motion to suppress all of the evidence stemming from the traffic stop (on the ground that the stop was allegedly illegal), and to suppress the evidence obtained under an ensuing search warrant (the video recording that Shorthill's wife made, using her camcorder, of the police pursuit).

When it was Shorthill's turn to cross-examine the police officer who testified at this hearing, he kept inserting factual assertions and comments into his questions, despite repeated warnings from the judge that this was improper. In addition, Judge Card had to inform Shorthill that his arguments on his motion could not be made while he was questioning the witness, but had to be made afterwards.

Shorthill spent a significant portion of the hearing asking questions based on the theory that it was unlawful for the police to seize the rifle from his car at the time of the traffic stop because (1) the rifle was not evidence of the traffic offense which triggered the police pursuit (*i.e.*, speeding), and because (2) Shorthill was never charged with a weapons offense. He also asked several questions based on the mistaken theory that an application for a search warrant must be based entirely on affidavits submitted by people who have personal knowledge of the facts — and that, therefore, the search warrant in his case was unlawful, since the search warrant application contained hearsay assertions made by the other officers who participated in the pursuit and traffic stop.

In addition, Shorthill again asserted that he had not received all the discovery he was entitled to. He argued that Judge Wolverton had issued a court order in December 2005 that entitled him to everything he asked for, and not just the materials that the judge had released following his *in camera* review. Judge Card told Shorthill that the discovery ruling had been made, and that Shorthill was not entitled to any additional materials.

Toward the end of this hearing, the prosecutor urged Judge Card to reconsider his ruling that Shorthill was competent to represent himself. The judge conceded that Shorthill was having trouble following the rules of procedure, but the judge concluded that things had not reached the point where it was necessary to revoke Shorthill's permission to represent himself.

Following this discussion, Shorthill again asserted that he had not received all the discovery he was entitled to, and Judge Card again declared that the issue of discovery was concluded.

The suppression hearing was then continued until September 2007.

At the resumption of the suppression hearing on September 4th, an attorney for the Municipality of Anchorage appeared and objected that Shorthill had served a

subpoena *duces tecum* on a police officer — Sgt. Pablo Paiz — for the apparent purpose of circumventing Judge Wolverton's discovery ruling. This subpoena purported to require the officer to produce some of the materials that Judge Wolverton had declined to disclose to Shorthill following his *in camera* review.

When Judge Card declared that he would not allow this, Shorthill did not argue the point. Instead, Shorthill told the judge that he still wished to call Sgt. Paiz, and that he would have Paiz testify about other matters.

A little later in the hearing, when another officer took the stand, Shorthill disagreed with the officer's answers, and Shorthill kept making assertions about his own recollection of events. Judge Card warned Shorthill not to do this.

Still later, when Paiz took the stand, Shorthill repeatedly asserted that Paiz had been constructively "on the scene" and "present" when Shorthill was arrested — based on the theory that the sergeant was the on-duty supervisor that day, and that he was talking to the officers in the field by radio. Thus, when Paiz testified that he arrived on the scene after the incident was over, and after Shorthill was in custody, Shorthill objected that "the [officer's] answer is not true".

Later during the suppression hearing, Shorthill told Judge Card that he wanted to challenge the police officers' use of spike strips to try to stop his car, on the theory that this was an unjustified use of "deadly force". The judge sustained the prosecutor's objection to this line of questioning.

(See *State v. Sundberg*, 611 P.2d 44, 51-52 (Alaska 1980), which holds that police officers' use of excessive force in making an arrest is not a ground for suppressing the evidence resulting from that arrest.)

A few moments later, the prosecutor objected to another of Shorthill's questions, on the ground of lack of relevance, and Judge Card sustained the prosecutor's

objection.  In response, Shorthill declared, "I object", and he began to assert that the contemplated answer was "very relevant".

Judge Card explained to Shorthill that he was entitled to object to the prosecutor's questions, or to the witness's answers, but that he could not object to the judge's rulings after the ruling was made.

A few minutes later, Shorthill returned to questions about the officers' use of the spike strips — which he now categorized as "excessive force".  At this point, Shorthill's wife interrupted her husband, asking him what relevance this had to the police seizure of their property during the traffic stop.  Shorthill apparently had no answer for this, because he then said, "Oh.  I have no further questions."

At this point, Shorthill drew Judge Card's attention to Alaska Criminal Rule 53 — the rule which declares that the Rules of Criminal Procedure "are designed to facilitate business and advance justice", and that the rules "may be relaxed or dispensed with ... in any case where it shall be manifest to the court that a strict adherence to them will work injustice."  The following colloquy then ensued between Shorthill and Judge Card:

> *Shorthill*:  I want to show that [this witness is] not telling the truth, and I don't have the mechanism to do [that] right now, because you've denied me the means.  I'm not sure what the cause is.  But I'm going to try and comport myself the best I can to fit the rules.
>
> *The Court*:  All right, but we ...
>
> *Shorthill*:  Now, my understanding was, this is an area to present evidence, and to distinguish whether things can be used or not, and a basis on why.  The format is that this was a malicious prosecution ... from an incident that happened ...

At this point, Judge Card interrupted Shorthill, excused the witness, and told Shorthill that he would not be allowed to lecture the court about its duties. The judge then added:

> *The Court*: I'm trying my best to have a lawful proceeding and a fair proceeding. But you're out of your depth. I've told you over and over again, but you continue to ... insist[] on representing yourself. So you'll have to suffer the consequences of that. I can't be your lawyer.
>
> Is the next [witness] someone you want to [view] the video tape, Mr. Shorthill?
>
> *Shorthill*: Well, I have to confess, at this point I'm so confused — that the [video] tape is relevant, but it's not relevant. It's evidence, but it's not evidence. It's used to refresh, but it's not. I'll have to get the recording [of] this proceeding and have it transcribed, so I can [study] it and figure it out, because ...
>
> *The Court*: Talk to Mrs. Shorthill. I think she understands what's going on, and I wish she were your lawyer.

A little later, Judge Card adjourned the suppression hearing. The hearing resumed on September 18, 2007.

At the beginning of the proceedings on September 18th, when Judge Card asked if the parties were ready to proceed, Shorthill declared that he was not ready. Shorthill then voiced a barely comprehensible accusation that Judge Card had prevented him from presenting his case and making his record.

In reply, the judge explained that the current hearing dealt only with Shorthill's suppression motion, and that this was not the time for Shorthill to raise all of his other concerns about the case. Shorthill responded with statements about the

appearance of injustice, and how there was a court rule that addressed that issue. Judge Card directed Shorthill to sit down and told him that he was required to confine his remarks to the issue in front of the court (*i.e.*, the suppression motion).

A few minutes later, when Shorthill was examining a police witness, he asked the officer a series of questions suggesting that the officer did not follow standard departmental procedures when he pursued Shorthill's vehicle, and that suspects are not required to cooperate with the police, and that the use of restraint must be reasonable. Judge Card then explained to Shorthill that, while these issues might be relevant to Shorthill's contemplated civil lawsuit against the police, they were not relevant to the legality of the traffic stop.

When questioning resumed, Shorthill asked the officer if it was true that he (Shorthill) and his wife had a right to drive to a safe place if they were in fear for their lives. The officer answered no — that a person is not allowed to "drive for six or seven miles and — and elude the police." When Shorthill retorted, "Where is that written down, sir?", the prosecutor objected, and Judge Card interrupted the questioning.

A little later, Shorthill asked the officer a series of questions suggesting that the police conducted the pat-down search of his wife in an improper way, and that therefore her Fourth Amendment rights were violated. The prosecutor objected that this was irrelevant to the suppression motion, since no evidence was found during this pat-down. Judge Card then pointed out that, even if Shorthill's wife's rights had been violated, she was not the defendant in the case.

A few minutes later, Shorthill asked this witness if he had brought the materials required by the subpoena *duces tecum*. Apparently, this was another attempt by Shorthill to circumvent Judge Wolverton's earlier discovery ruling — by having the officer bring materials that the judge had refused to disclose following the court's *in*

*camera* review. Once Shorthill's tactic was clarified, Judge Card declared that he would not allow this.

When Shorthill resumed his examination of the officer, Shorthill used questions as a method for testifying about his version of events. He asked a series of questions pertaining to the police seizure of the video camera that his wife had used to record the police pursuit, and then he asked, "What crime did the camera commit?"

Shorthill also asked, or said that he wished to ask, many questions about other topics that had little or no apparent relevance to the suppression motion in front of the court. For instance, Shorthill asked the officer if he had filed a "use of force" report after the pursuit and traffic stop — apparently on the theory that the pursuit constituted the use of deadly force. Shorthill also wanted to ask questions suggesting that the officers violated departmental policy by engaging in "idle chit-chat" while they were speaking to each other on the emergency radio channel during their lengthy pursuit of Shorthill's vehicle. And after one officer testified that his in-car camera wasn't working on the day in question, and had been sent for repairs, Shorthill wanted to ask if it was proper for the officer to be driving this patrol car when its equipment was not all functioning properly.

Later on, when Judge Card again reminded Shorthill that the only issue before the court was the existence of probable cause for the traffic stop and the seizure of evidence, Shorthill responded by asking the police witness, "What was the probable cause to violate the passenger's [*i.e.*, his wife's] Fourth, Fifth, and Fourteenth ... Amendment protections in this particular incident?"

At the conclusion of the hearing, Shorthill delivered his suppression argument to the court. Shorthill's argument was rambling and unfocused, and he repeatedly tried to testify during the course of his remarks. In addition, Shorthill's argument was full of legal *non sequiturs* and assertions of fact outside the evidence.

Two days later, Judge Card denied Shorthill's suppression motion in an oral decision announced on the record.

After Shorthill's suppression motion was denied, his case was called for trial — initially in September 2007, but later rescheduled for early October 2007. Superior Court Judge Philip R. Volland presided over the October trial calls.

The prosecutor asked Judge Volland to delay the start of Shorthill's trial until October 15th, because a key witness (one of the police officers) was not available until then. In response to the prosecutor's request, Shorthill declared that there were still "a number of outstanding motions".

When Judge Volland told Shorthill that there were no undecided motions, Shorthill responded that there was "a two-year-old outstanding motion" — and that, because this motion had remained undecided for two years, the time for bringing him to trial under Criminal Rule 45 had expired. Shorthill then declared that "[he was] not going to go forward until that issue [*i.e.*, the Rule 45 issue] [was] dealt with".

Judge Volland responded that Shorthill's objection was "noted" — and then the judge declared that Shorthill's trial would begin on October 15th. In response to Judge Volland's ruling, Shorthill continued to object that Rule 45 had run, based on his theory that there were outstanding motions that had remained undecided for much longer than 30 days. Judge Volland told Shorthill that his objection was preserved — but the judge added, "There are no outstanding motions, [and] from the court's calculation, Rule 45 has not expired, [and] it does not expire until October 22nd."

Shorthill then presented an alternative objection: he told the judge that his case could not go forward because no omnibus hearing had been scheduled in his case. Shorthill told Judge Volland that the law required the superior court to hold an omnibus hearing in all criminal cases. Shorthill then declared, "That's a requirement that's been

forgotten about and neglected since the beginning of this [case]".  Shorthill claimed that an omnibus hearing "has to be scheduled or [my] case can't go forward."

Judge Volland responded to Shorthill's argument by simply saying, "Mr. Shorthill, the case is going forward on October 15th to trial."  When Shorthill continued to object, the judge told him, "Your objection is preserved, ... but I'm trying to tell you [to] be ready for trial."  This led to the following colloquy:

> *Shorthill*:  What [does] my objection being "pre-served" entail?

> *The Court*:  It means it's preserved for the purposes of any appellate review.

> *Shorthill*:  In other words, ... I [can] take [this issue] to appellate review now, so that we can get this thing resolved ...

> *The Court*:  It's not ...

> *Shorthill*:  Because that's a ruling ...

> *The Court*:  It's not ...

> *Shorthill*:  ... of law that's ...

> *The Court*:  It's not — You can try ...

> *Shorthill*:  ... void.

> *The Court*:  ... a petition if you want, Mr. Shorthill, but it's really not ripe for appellate review unless you're convicted, I can tell you that.

> *Shorthill*:  Well, since the motion for a Rule 45 [dismissal] has been done in error and/or through neglect

and/or through maliciousness, it is ready for review by appellate ...

*The Court*:  No.

*Shorthill*:  ... because the fact [is] it [has] run, and the fact that the Rule 45 [time] having been run means that you don't have any authority any longer, and [my] case is closed.

*The Court*:  You're welcome to take a petition to the Court of Appeals if you wish, Mr. Shorthill, but that doesn't do anything to the scheduling [of your trial].  You're set for trial [on] October 15th.

    . . .

*Shorthill*:  Well, as far as the players and the actors, I'm very unimpressed, and I object to the whole process.

Shorthill did indeed petition this Court to review Judge Volland's decision — a petition that this Court denied on October 23rd.

Judge Wolverton held a pre-trial conference in Shorthill's case the following day (October 24th).  Shorthill appeared at this conference telephonically.

At this pre-trial conference, Judge Wolverton announced that "it appears that we're on track to try [this] case", and the prosecutor told the judge that the State was ready for trial.  Judge Wolverton then addressed Shorthill:

*The Court*:  Mr. Shorthill, you'll be ready?

*Shorthill*:  Your Honor, I'm here to inform you that [the prosecutor] lied to the appellate court in his brief. Excuse me, sir ...

*The Court*:  No, no, no.

*Shorthill*:  Don't interr ...

2462

*The Court*:  I'm asking the questions.

*Shorthill*:  Don't stop me ...

*The Court*:  ... Are you ready for trial [on] November 26th?

*Shorthill*:  No, sir.

*The Court*:  All right.  Then what is your request?

*Shorthill*:  I would like this Court to address the two-year-old motion that you failed to address, and you pushed off on other people.  And I'd like you to do it, and finish this case.

*The Court*:  Mr. Shorthill, all motions have been ruled on.

*Shorthill*:  No, sir, they have not.  I have an example ...

*The Court*:  Mr. Shorthill, ...

*Shorthill*:  ... (indiscernible) not been ready ...

*The Court*:  Don't — All right, we'll hang up on Mr. Shorthill [now].

Shorthill's trial ended up being delayed, and Judge Volland held a trial call on November 30, 2007.  When the judge asked the parties how long they anticipated the trial to be, Shorthill again returned to his theory that Rule 45 had expired because the court had allowed outstanding motions to remain undecided for more than 30 days:

> *Shorthill*:  Rule 45 is way past due.  It was told to me via the secretary that [the time expired] on the 22nd of October.  On the 20th of September, and again on the 4th of October.  I filed a — an appellate review on some bad decisions, and I did that on the 10th of October.  Okay?  [And] they ruled on it on the 23rd of October, and it says now that the Rule 45 [deadline] is 15 December.  There's no basis for that, sir.  And the 13 to 15 days that my appellate review was in certainly doesn't constitute to the 15th of December from the 22nd of October, sir.  [Accordingly,] Rule 45 is done waived and gone ... , and I'm done, respectfully, sir.

Judge Volland told Shorthill that he was not dismissing the case, but that Shorthill's Rule 45 objection was preserved.

In response to the judge's ruling, Shorthill argued at length that there were, indeed, outstanding (*i.e.*, undecided) motions in his case, and that the superior court lacked the authority to hold the trial as long as there were undecided motions.  Shorthill also again argued that it was improper to hold the trial because no omnibus hearing had been scheduled.  And he again argued that, regardless of whether there were undecided motions, Rule 45 had expired on October 22nd.  Judge Volland did not alter his ruling.

The superior court finally called Shorthill's case for trial in front of Judge Wolverton on December 3, 2007.

At the beginning of the proceedings on December 3rd, just before jury selection was to begin, Judge Wolverton formally announced that this was the time set for trial, and he asked the parties if they were ready to proceed.  Shorthill responded that he had "a number of things that need to be dealt with prior to trial".  Judge Wolverton told him, "All right.  Go ahead." — which led to the following colloquy:

> *Shorthill*:  We have an issue of outstanding discovery.

*The Court*:   Judge Card and I have reviewed this. There is no outstanding discovery.  The rulings have been made.  ...  What have you not received?

*Shorthill*:   On the 15th of December of 2005, we had a very long time, and we chatted back and forth, and I had a list of 24 items that you said, it's my list, I could have anything I wanted on that list.  You told the public defender that you forced on me against my will ...

*The Court*:  Mr. Shorthill, we're not going to do this. I've made my rulings, and so has Judge Card.  If you feel you need to appeal something, you may appeal it.  We're not going to go through this any more.

Shorthill then raised his Rule 45 claim again:

*Shorthill*:   On the — now, let's see here — on September 20th, I was emailed a document that said that [the] Rule 45 [deadline] was the ... 22nd of October.  Okay.  On the 29th of November, it switched to the 15th of December for Rule 45.  I would like an explanation of that, because I only interrupted 13 days on my [petition for review], and that's all that's accountable to me, so the 22nd ...

*The Court*:  I'll have my ...

*Shorthill*:  ... plus 13 [days] ...

*The Court*:  ... secretary run a calculation, but you have accepted a trial [date] within Rule 45.  We're ready to proceed today.

*Shorthill*:  No, sir, I haven't.

*The Court*: Now, Mr. Shorthill, I've made a ruling. You may appeal it if you wish.

*Shorthill*: Okay. So what is your ruling then?

*The Court*: It's that [the] Rule 45 [deadline] is December 15th.

. . .

*Shorthill*: I need [an] explanation, sir.

*The Court*: No, actually, I'm not going to explain it. I've got 50 [prospective jurors] waiting downstairs. We're going to trial. This case will not be dismissed [under] Rule 45.

Shorthill then launched into a series of further objections to holding the trial:

*Shorthill*: So [that] I have this right in my mind, I'm kind of going to talk out loud, so that you can correct me if I'm wrong. What we did on the 15th of December of 2005, and how it turned out, is the ...

*The Court*: I'm not ...

*Shorthill*: ... way it is?

*The Court*: That issue is done. Discovery is complete. Period. We're moving on. I've made my rulings. If you believe I'm wrong, and you need to appeal it later on, you may appeal it to the Court of Appeals. I'm not going to discuss it any more.

*Shorthill*: Okay. Okay. I asked you on the, I think it was the 4th of October, 2006, but I'm not positive of the date, I could get the tape and replay it and figure it out, but ...

*The Court*: ... What is it you're requesting?

*Shorthill*: I asked you what your authority, your jurisdictional authority was in this case. And your answer was, I don't know.

*The Court*: I don't understand your question. I'm a superior court [judge] appointed according to the rules and authority of the government of Alaska. I preside over felony cases.

*Shorthill*: Okay. So do you have an oath of office?

*The Court*: I do.

*Shorthill*: Okay. Do you have an official bond?

*The Court*: No, it's not required as a superior court judge.

*Shorthill*: It is required, because ...

*The Court*: No, it's ...

*Shorthill*: ... it goes back ...

*The Court*: ... not.

*Shorthill*: ... to ...

*The Court*: That's not going to ...

*Shorthill*: ... 1943, sir.

*The Court*: ... delay this trial. You may appeal that, too. If you think that I [don't] have jurisdiction, you can appeal that. But we're not going to discuss jurisdiction with 50 jurors downstairs. I've got jurisdiction in this case. And I'm exercising it.

– 28 –

2462

Despite Judge Wolverton's ruling, the next several pages of transcript are filled with Shorthill's questions concerning the judge's oath of office, the judge's "commission of office", and the judge's bond. Shorthill explained that he was asking this series of questions because he was "just trying to make sure that we have the right people doing the right things at the right time." Judge Wolverton repeatedly told Shorthill that his case was not going to be dismissed — and that it was going to trial that morning.

Shorthill then returned to the subject of undecided motions. He produced a copy of some paperwork from his file: specifically, a motion that Shorthill filed for the return of property allegedly seized by the police illegally, together with an accompanying proposed order granting the motion. Shorthill noted that his proposed order was unsigned — which he interpreted to mean that his motion "was never dealt with". Shorthill claimed that this was "proof positive" that there was at least one unresolved outstanding motion.

When the prosecutor pointed out that Judge Card had denied this motion at the conclusion of the suppression hearing, Shorthill responded by asserting that Judge Card had interfered with his ability to examine the witnesses who had been subpoenaed to attend the evidentiary hearing. Judge Wolverton told Shorthill that he would "have to take that up on appeal".

Shorthill then returned to his claim that his trial could not go forward because the court had never held an omnibus hearing. Judge Wolverton told Shorthill that he had already received several pre-trial hearings, and that he was not entitled to any additional ones.

After Shorthill's above-described motions proved unsuccessful, Shorthill announced that he had arranged for "an attorney general from the Lower 48" to work

with him on the case. For this reason, Shorthill told Judge Wolverton, he would be asking "for some time to get [this attorney] up to speed".

In response to this announcement, Judge Wolverton asked Shorthill, "So you are going to have a lawyer represent you?" Shorthill replied, "I am working with an attorney general at this point. And he is willing to work with me, yes, sir."

The judge next asked Shorthill if he had a telephone number for this lawyer, so that they could "get him on the line" right then. The phone number was produced, and Judge Wolverton's in-court clerk made the call. When the attorney, Greg Quinlan, came on the line, the following conversation ensued:

> *The Court*: Mr. Quinlan, this is Judge Wolverton from Anchorage, Alaska. ... I appreciate your taking the call on short notice. We are on record here, prepared for jury selection outside the presence of the jury in a case involving the State of Alaska versus Mr. Carry Shorthill, who's here with his wife. Mr. Shorthill has just advised me, in advance of bringing the jury up, that he has contacted you and is interested in having you assist him with his case.

> *Quinlan*: Now, I'm not licensed in Alaska, nor do I think that we could find an attorney that could represent him on short notice. I have advised him that he ought to at least get a public defender to sit with him and advise him as to the evidentiary rules, because [I've] got serious concerns about his ability to ...

> *The Court*: Represent himself?

> *Quinlan*: Yes. And frankly, I guess if I was his legal counsel, I would be asking the Court to submit him to a mental evaluation. ... I've got serious concerns about his situation, but I don't see how I can help him.
> 
> . . .

*The Court*: All right. As I understand it, ... Mr. Shorthill ... is requesting a brief continuance so that he can get the assistance of counsel. Is that correct, Mr. Shorthill?

*Shorthill*: Yes, sir.

*Quinlan*: I suspect that him having assistance of counsel is essential to putting on a proper trial.

*The Court*: Okay.

*Quinlan*: And, like I said, I'll be happy to look at ... anything that [Shorthill sends] down [to me], and I'll be happy to go over those and explain what they mean, and what I think that they represent [from] an evidentiary standpoint. But I cannot represent anybody in Alaska. Nor do I have contact with any attorney in Alaska at this point.

*The Court*: Okay, Mr. Quinlan. Thank you very much again, and we'll let you hang up now.

Following this phone conversation, Judge Wolverton asked Shorthill directly if it was now his intention to have an attorney represent him. Shorthill replied, "No. I didn't say that I wanted [the attorney] to take over in my stead, but [only] to assist me, as [someone] knowledgeable in the law[.]"

But after hearing Shorthill's reply, Judge Wolverton declared that he no longer believed Shorthill was capable of representing himself:

*The Court*: I think Mr. Quinlan pointed out [some] things that concern me about this situation, Mr. Shorthill. Number one, he indicated what I believed all along. [I know that] Judge Card made his ruling [allowing you to represent yourself], ... but I still get to make my own independent assessment. I don't think there's any way that you're capable of representing yourself in this matter. I don't think that you

– 31 –

have the understanding of the system. I think it would be an injustice for you to represent yourself in this matter. I think you need an attorney.

*Shorthill*: Well, sir ...

*The Court*: And ... if you're not ready to go to trial, we'll deal with that, and then what — we can talk later on this morning about getting an attorney. And we'll be tolling Rule 45 to get somebody available. But if you're seeking more time to consult with Mr. Quinlan, you're entitled to do that. You can ask him questions, you can send materials down, but he's indicated he can't represent you. There's going to have to be a licensed attorney that's going to represent you here in Alaska.

(Whispered conversation)

*The Court*: If you're requesting a continuance, for how long are you requesting?

(Whispered conversation)

*Shorthill*: Under the circumstances, I would be asking for 120 days.

The judge told the parties that he was going to release the jury panel, and take a short recess, and then court was going to reconvene to settle the matter of Shorthill's representation.

When court reconvened, Judge Wolverton formally ruled that Shorthill could no longer represent himself:

*The Court*: [Mr. Quinlan] said he doesn't think there's any way in the world you can represent yourself, and I don't believe there is either. I think that you're simply not

– 32 –

qualified.  That's not criticism [of you].  ...  But you've had a very difficult time, it seems to me, following the procedural flow of things.  And I'm going to require that you be represented by counsel.  You can hire somebody if you wish.  And we're going to set up a time frame for you to find an attorney.  And if you don't find an attorney within that time frame, I'll appoint an attorney at your expense to represent you.  ...

Now, if you want some time to look for an attorney, that's fine.  If you don't want to look for an attorney, I'm simply going to appoint a court-appointed counsel at your expense.  Would you like some time to try to find a lawyer?

*Unidentified Speaker*: Yes.

*Shorthill*:  Yes, sir.

Shorthill's case ultimately went to trial more than three years later, in December 2010.  Shorthill was represented at this trial by the Public Defender Agency.

*(b) The law pertaining to self-representation, and why we uphold the superior court's decision to require Shorthill to be represented by an attorney*

As we explained earlier in this opinion, the United States Supreme Court has held that defendants in criminal cases have a constitutional right to reject the assistance of counsel and to represent themselves.  *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

This right of self-representation exists alongside the constitutionally guaranteed right to the assistance of counsel.  Between these two rights, the right of representation by counsel is paramount.  As this Court explained in *James v. State*,

[A] trial in which [the defendant] is unrepresented by counsel is [often] a farcical effort to ascertain guilt. Thus, [even though] a defendant has clearly and unequivocally declared his or her intention to appear *pro se*, the trial judge must [nevertheless] conduct a thorough inquiry [before allowing the defendant to proceed without an attorney].

730 P.2d 811, 814 n. 1 (Alaska App. 1987). [3] The inquiry mentioned in this passage from *James* must take place on the record, and it must include advising the defendant of the right to counsel, the important advantages of having counsel, and the dangers and disadvantages of self-representation. *Id.* at 813-14; *Gladden v. State*, 110 P.3d 1006, 1009-1010 (Alaska App. 2005). In addition, the court must affirmatively find that the defendant is minimally capable of planning a defense and presenting a coherent case to the jury. *Ramsey v. State*, 834 P.2d 811, 814 (Alaska App. 1992); *Burks v. State*, 748 P.2d 1178, 1180, 1183 (Alaska App. 1988).

As we have explained, Shorthill waived his right to an attorney in November 2006 and chose to represent himself, after being represented by counsel for the first year of his litigation. The superior court allowed Shorthill to do this, and the validity of that 2006 decision is not directly challenged in this appeal. Rather, the issue presented here is whether the superior court acted properly when it re-evaluated its decision in October 2007 and concluded that it would be fundamentally unfair to allow Shorthill to represent himself at trial.

The leading case on this issue is the United States Supreme Court's decision in *Indiana v. Edwards*, 554 U.S. 164, 128 S.Ct. 2379, 171 L.Ed.2d 345 (2008). In *Edwards*, the Supreme Court concluded that trial courts have the authority to restrict the right of self-representation in situations where defendants, because of mental illness, "are

---

[3]   Modified on rehearing, 739 P.2d 1314 (Alaska App. 1987).

not competent to conduct trial proceedings by themselves." *Id.*, 554 U.S. at 178, 95 S.Ct. at 2388.

In reaching this decision, the Supreme Court drew a distinction between a defendant's competency to stand trial (*i.e.*, competency to understand the proceedings, to confer with counsel, and to assist counsel in preparing the defense [4]) versus a defendant's competency to conduct a defense unaided by counsel. The Court concluded that this latter task required a greater degree of competency:

> [This Court's cases dealing with a defendant's competence to stand trial] set forth a standard that focuses directly upon a defendant's "present ability to consult with his lawyer[.]" ... These standards assume representation by counsel and emphasize the importance of counsel. They thus suggest ... that an instance in which a defendant who would choose to forgo counsel at trial presents a very different set of circumstances, which[,] in our view, calls for a different standard.
>
> . . .
>
> [A]n individual may well be able to satisfy [the] mental competence standard [to stand trial], [in that they] will be able to work with counsel at trial, yet at the same time [they] may be unable to carry out the basic tasks needed to present [their] own defense without the help of counsel.

*Edwards*, 554 U.S. at 174-76, 95 S.Ct. at 2386.

As examples of the "basic tasks" necessary to conduct a criminal defense, the Court cited its earlier decision in *McKaskle v. Wiggins*, 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984), where it described the component tasks as: organization of the defense, making motions, arguing points of law, participating in voir dire, questioning

---

[4]   *See Drope v. Missouri*, 420 U.S. 162, 171; 95 S.Ct. 896, 903; 43 L.Ed.2d 103 (1975).

witnesses, and addressing the court and jury. *McKaskley*, 465 U.S. at 174, 104 S.Ct. at 949 (cited in *Edwards*, 554 U.S. at 176, 95 S.Ct. at 2387).

The Court noted that even when a defendant is mentally competent to stand trial, the defendant may be unable to accomplish these tasks due to "disorganized thinking, deficits in sustaining attention and concentration, impaired expressive abilities, [or] anxiety". *Edwards*, 554 U.S. at 176, 95 S.Ct. at 2387.

The Court then explained that, in situations where a defendant is unable to accomplish these basic tasks, the right of self-representation must give way to society's interest in having a fair trial:

> [The] right of self-representation at trial will not "affirm the dignity" of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel. ... To the contrary, ... the spectacle that could well result from his self-representation at trial is at least as likely to prove humiliating as ennobling. Moreover, insofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in [this] exceptional context undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial. ... *See Martinez* [*v. Court of Appeal of California*], 528 U.S. [152,] 162, 120 S.Ct. 684[, 691, 145 L.Ed.2d 597 (2000)] ("Even at the trial level ... the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer"). See also *Sell v. United States*, 539 U.S. 166, 180, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003) ("[T]he Government has a concomitant, constitutionally essential interest in assuring that the defendant's trial is a fair one").

*Edwards*, 554 U.S. at 176-77, 95 S.Ct. at 2387.

The Court noted that society's interest in a fair trial is actually two-fold: making sure that the trial is fair *in fact*, but also making sure that the public will *perceive* that the trial is fair:

> [Judicial] proceedings must not only be fair, they must "appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160, 108 S.Ct. 1692, [1698], 100 L.Ed.2d 140 (1988). ... The application of [the] basic mental competence standard can help in part to avoid this result. But given the different capacities needed to proceed to trial without counsel, there is little reason to believe that [this minimal standard of competence] alone is sufficient.

*Edwards*, 554 U.S. at 177, 95 S.Ct. at 2387.

Based on these considerations, the Supreme Court concluded that even when a defendant is competent to stand trial, "the Constitution permits judges to take realistic account of [a] particular defendant's mental capacities" when deciding whether the defendant is capable of conducting their own defense without the assistance of counsel. *Edwards*, 554 U.S. at 177-78, 95 S.Ct. at 2387-88. Thus, "the Constitution permits [courts] to insist upon representation by counsel for those [defendants] competent enough to stand trial ... but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Edwards*, 554 U.S. at 178, 95 S.Ct. at 2388.

In Shorthill's case, the record shows that Shorthill had significant difficulties in performing the defense-related tasks described in *Edwards*: organization of his defense, making motions, arguing points of law, questioning witnesses, and addressing the court. The record also supports the inference that Shorthill's inability to perform these tasks was due to some of the causes listed in *Edwards* — specifically, disorganized thinking and deficits in sustaining his attention and concentration.

The primary distinction between the facts of *Edwards* and the facts of Shorthill's case is that the defendant in *Edwards* was diagnosed with a mental illness severe enough that there was a question regarding his competence to stand trial at all. In contrast, when Judge Wolverton ruled that Shorthill had to be represented by an attorney, there was no finding that Shorthill suffered from a mental illness, nor was there any doubt as to his competence to stand trial.

We acknowledge that Shorthill himself told the district court judge at his pre-indictment hearing (in 2005) that he suffered from attention deficit disorder, for which he was taking medication — and that, without his medication, he was "not able to do the things that normal people can do". And we note that, at a later point in this litigation (in 2008), Shorthill's behavior was apparently so erratic that Judge Wolverton temporarily revoked his bail.

But the current record would not support a finding that Shorthill's difficulties in litigating this case by himself were the result of the same kind of mental illness that was present in *Edwards*. Thus, we must decide whether the result in *Edwards* hinged on the fact that the defendant was diagnosed as suffering from severe mental illness.

We conclude that the decision in *Edwards* did not turn on this fact. The problems discussed in *Edwards* — a defendant's inability to organize a defense, to formulate and present motions, to examine witnesses and present evidence, and to meaningfully argue points of law — are capable of prejudicing the fundamental fairness of criminal proceedings regardless of their precise cause.

This is not to say that we think the diagnosis of mental illness was irrelevant in *Edwards*. From time to time, *all* people suffer from the cognitive difficulties discussed by the Supreme Court in *Edwards* — anxiety, disorganized thinking, inability to express oneself cogently, and inability to sustain one's attention or concentration. The

question is whether, for a particular defendant, these difficulties are so persistent and pervasive as to undermine the fundamental fairness of the proceedings.

A diagnosis of severe mental illness can sometimes provide a reasoned basis for concluding that a particular defendant has the kind of persistent and pervasive difficulties that *Edwards* talks about. But in the present case, Shorthill's severe difficulties in defending himself were demonstrated in a different manner — by the record of Shorthill's year-long effort to litigate without the assistance of counsel.

Even though Shorthill initially invoked his right to counsel (and told the court that he was unable to defend himself), Shorthill later changed his mind. After Shorthill expressed the desire to represent himself, the superior court allowed him to do so for a year — starting in November 2006 and continuing until early December 2007, when Judge Wolverton finally imposed a lawyer on Shorthill.

During that year, and over the course of many court hearings (including a multi-day suppression hearing), Shorthill repeatedly demonstrated that he was not capable of performing "the basic tasks needed to present his own defense without the help of counsel." *Edwards*, 554 U.S. at 175-76, 95 S.Ct. at 2386.

The record developed during this year of self-representation provided a reasonable basis for Judge Wolverton to conclude that Shorthill suffered from the kind of persistent and pervasive problems identified in *Edwards* — problems that authorized Judge Wolverton, in the exercise of his discretion, to stop Shorthill from representing himself any longer.

For these reasons, we uphold the superior court's decision to require Shorthill to be represented by a lawyer.

*Shorthill's claim that he was not brought to trial within the time limits of Alaska Criminal Rule 45*

Shorthill argues that he was brought to trial outside the time limits of Alaska's speedy trial rule, Criminal Rule 45. Although Shorthill's case took nearly five years to come to trial, Shorthill's argument on appeal focuses on the approximately seven months between mid-December 2005 and mid-July 2006.

More specifically, Shorthill focuses on Judge Wolverton's handling of a motion that Shorthill filed in December 2005, seeking disclosure of various materials in the possession of the Municipality of Anchorage — materials that included the personnel files of the officers involved in this incident, as well as various police policy manuals, and police procedural and tactical manuals.

The filing of this discovery motion tolled the running of the Rule 45 clock. See *Drake v. State*, 899 P.2d 1385, 1388 (Alaska App. 1995), where we held that "the running of Rule 45 is tolled [under Rule 45(d)(1)] by the filing of a discovery motion that requires court action." But Shorthill argues that the Rule 45 clock resumed running shortly thereafter — on December 16th — when Judge Wolverton issued an order relating to Shorthill's discovery request.

In his December 16th order, Judge Wolverton granted disclosure of all of Shorthill's requested items — either directly to Shorthill's attorney, or to the court for an *in camera* review.

The copy of this order that is contained in the court file shows that it was served on the State, but it does not reflect that it was served on the Municipality of Anchorage (the possessor of the requested materials). Nevertheless, soon after the judge issued this order, an attorney representing the Municipality and another attorney representing the affected police officers appeared in court to contest the order. Both

attorneys filed pleadings in which they sought protective orders against the requested discovery — in essence, motions asking the court to reconsider its decision.

This led to three months of litigation — starting in late December 2005 and continuing through April 2006 — regarding (1) whether the Municipality had standing to object to the court's discovery order, and (2) whether, or to what extent, the court should modify its discovery order. In the meantime, the Municipality submitted the requested materials to Judge Wolverton for his *in camera* review.

On April 20, 2006, Judge Wolverton issued an order informing the attorneys for the Municipality and the police officers (1) that he had completed his *in camera* review of the documents, and (2) that he had tentatively decided to disclose some, but not all, of the requested documents to the defense. Judge Wolverton furnished these selected documents to the Municipality and the police officers, and (at the same time) the judge scheduled a hearing where the parties (including the Municipality and the officers) would have a final opportunity to present arguments concerning the scope of the disclosure.

Those hearings took place on May 2nd and 3rd. Toward the conclusion of the May 3rd hearing, Shorthill's attorney told Judge Wolverton that he wanted the judge to continue the next pre-trial hearing for a period of six weeks — presumably to allow time for the defense to examine the disclosed materials and pursue any investigation suggested by them. Judge Wolverton granted this request for a continuance, setting the next pre-trial conference for June 13th. But at the same time, the judge announced that the Rule 45 expiration date for bringing Shorthill's case to trial would be extended to July 10th.

Immediately after Judge Wolverton made this announcement, Shorthill's attorney told the judge that Shorthill believed Rule 45 should run against the State during this additional six-week period. But Judge Wolverton pointed out that, unless Rule 45

was tolled, the Rule 45 clock would expire on June 1st — *i.e.*, before the pre-trial conference that the judge had just calendared for June 13th at the request of the defense. Judge Wolverton then told the defense attorney:

> *The Court*: You have to decide what it is you want to do. [I am] clearly going to toll [Rule 45] through the next pre-trial conference if you're requesting six weeks to review [the discovery materials]. ... [So] the trial date is going to be July 10th. [And] Rule 45 is going to toll to July 10th.

On May 10, 2006 (*i.e.*, one week after the May 3rd hearing), Judge Wolverton issued his final discovery order. In this order, the judge released a specified packet of documents to the State and to the defense, with the stipulation that "neither party [could] use any of the documents for any purpose whatsoever without prior application to the court."

On June 13th, Shorthill's attorney filed a motion asking Judge Wolverton to reconsider his limitation on the parties' use of the discovery materials. The judge held a hearing on this request that same day. At this June 13th hearing, the defense asked for a four-week continuance of Shorthill's case — in other words, a continuance beyond the July 10th trial date that Judge Wolverton had previously announced. This request was granted.

Shorthill does not challenge any of the rest of the time that it took to bring his case to trial.

The heart of Shorthill's argument on appeal is that Judge Wolverton's discovery order of December 16, 2005 — the order in which the judge apparently granted Shorthill's discovery request in full — was a final order that should have been enforced, since neither the State nor the Municipality nor the police officers individually ever directly opposed the order, nor did they file a pleading that was expressly labeled

a "motion for reconsideration" of the order. Shorthill argues that, to the extent Judge Wolverton delayed enforcing his order for seven months (to allow the Municipality and the officers to seek a narrower scope of disclosure than originally ordered), the judge acted improperly, and the elapsed time should have counted against the State.

It is true that the Municipality and the police officers did not use the words "reconsideration" or "opposition" in the titles of their pleadings; rather, they styled their pleadings as motions for "protective orders" against the disclosures called for in Judge Wolverton's December order. But as this Court recently observed in *Crawford v. State*, "the character of a pleading is determined by its subject matter and not its designation." 337 P.3d 4, 15 (Alaska App. 2014). [5] The Municipality and the officers were seeking reconsideration and modification of the judge's December order, regardless of the exact words used in their pleadings.

The litigation of these matters — *i.e.*, whether the Municipality and the officers had standing to contest the scope of Judge Wolverton's December order, and (if so) whether the judge should modify the scope of that order — was a direct consequence of Shorthill's initial motion for discovery. Thus, the time it took to conduct this litigation was attributable to Shorthill's motion, and Rule 45 was tolled until this litigation was completed.

As an alternative argument, Shorthill contends that Rule 45 should have started running against the State on March 8, 2006 — the day after Shorthill's attorney filed a pleading that Shorthill now describes as a "non-opposition" to the protective orders sought by the Municipality and the police officers. But Shorthill mischaracterizes the pleading that his attorney filed on March 7th.

Far from being a "non-opposition" to the Municipality's and officers' requests for modification of the discovery order, the defense attorney's pleading (by its

_____

[5]     Quoting *State v. Moad*, 294 S.W.3d 83, 86 (Mo. App. 2009).

very title) was a "partial opposition" to these requests for modification. And although "partial opposition" is, technically speaking, an accurate description of this pleading, Shorthill's attorney in fact objected to all but a fraction of the modifications sought by the Municipality and the officers.

With regard to the standing issue, Shorthill's attorney declared that she was "opposed to the Municipality's further involvement in this case", given the fact that the officers themselves had filed a separate challenge to the superior court's discovery order. And with regard to the scope of disclosure described in the superior court's December order, Shorthill's attorney continued to assert that all the documents Shorthill was seeking were "material and ... relevant to the facts of this case".

The only information that Shorthill's attorney now said she was willing to do without was the "private information contained [in] the relevant documents" — specifically, "the officers' home addresses, [any] identifying information about [their] spouses and children, ... financial information, social security numbers, telephone numbers, [and] insurance information [identifying their] beneficiaries". The defense attorney agreed that this information could be redacted from the relevant documents before they were produced to her. But she continued to insist on production of all the documents encompassed by Shorthill's discovery motion.

Thus, Shorthill is completely mistaken when he asserts in his brief that this March 7th pleading "indicated to the trial court that further litigation of the discovery issue was unnecessary".

We therefore conclude that Rule 45 was tolled during the time attributable to the litigation and resolution of Shorthill's discovery motion — from the filing of the motion in December 2005 until Judge Wolverton's issuance of his final order regarding this matter on May 10, 2006.

But the Rule 45 clock did not begin running again on May 10th — because, as we have already explained, Shorthill's attorney (acting in anticipation of the court's final discovery order) had already requested a six-week continuance of the proceedings when the parties came to court for the hearing on May 3rd.

When Judge Wolverton granted these additional six weeks, and set Shorthill's trial for July 10th, he expressly ruled that Rule 45 would be tolled until this July 10th trial date — because, if Rule 45 was not tolled, it would expire before the six weeks had elapsed. Shorthill does not challenge this ruling on appeal.

For these reasons, we conclude that Shorthill's speedy trial claim has no merit.

*The superior court's decision to let the State introduce evidence of the semi-automatic rifle in Shorthill's vehicle at the time of the traffic stop*

As we described early in this opinion, when Shorthill finally stopped his truck, he refused to get out of the vehicle. In the process of pulling Shorthill from the truck, one of the officers observed an SKS semi-automatic rifle lying in the cab of the truck, and this rifle was seized.

This, however, was not the State's only evidence pertaining to the rifle. As we have also explained, Shorthill's wife was using a video camera to film their encounter with the police. This video showed the rifle on Shorthill's lap during the police chase.

Shorthill's attorney sought to preclude the State from introducing any evidence of the rifle at his trial. He argued that the rifle was not used to threaten the officers, that the officers were unaware of the rifle until after the pursuit was over, and that the rifle was not otherwise relevant to the charges. But the State argued that Shorthill's actions with the rifle (laying it on his lap) tended to prove his state of mind — his attitude toward the police — during the pursuit.

On appeal, Shorthill argues that because his possession of the rifle was lawful, and because he did not use the rifle to assault any of the officers, the fact that he had the rifle in the truck was irrelevant — or, if minimally relevant, it was more prejudicial than probative.

We agree that evidence of the rifle was potentially unfairly prejudicial, but Shorthill's decision to place the rifle on his lap during the highway pursuit was also potentially probative of Shorthill's contemporaneous state of mind. See *Lerchenstein v. State*, 697 P.2d 312, 317-19 (Alaska App. 1985), [6] where this Court upheld the admission of evidence that a murder defendant had been "angry and combative ... immediately prior to the [homicide]."

On balance, given the record before us, Shorthill has failed to convince us that the potential unfairness of this evidence so clearly outweighed its probative value that the superior court erred in admitting the evidence. We therefore uphold the superior court's decision.

*Shorthill's argument that the State violated its duty to present exculpatory evidence to the grand jury*

Under Alaska law, a prosecutor who presents a case to the grand jury has a duty to apprise the grand jurors of exculpatory evidence. *Frink v. State*, 597 P.2d 154, 164-66 (Alaska 1979). However, this obligation "extends only to evidence that tends, in and of itself, to negate the defendant's guilt." *Cathey v. State*, 60 P.3d 192, 195 (Alaska App. 2002). A prosecutor is not required "to develop evidence for the defendant [or] present every lead possibly favorable to the defendant." *Frink*, 597 P.2d at 166.

---

[6]    Affirmed, 726 P.2d 546 (Alaska 1986).

Shorthill asserts that the prosecutor who presented his case to the grand jury violated this duty in two ways: by failing to present the video recordings that were taken by cameras mounted inside the patrol cars of Officers Conley and Dykstra, and by failing to play the audio of the 911 call that Shorthill made while the police were pursuing him.

With respect to the videos taken by the dashboard cameras, Shorthill argues that this video evidence is exculpatory because it contradicts Officer Conley's testimony to the grand jury regarding the third-degree assault charge.

Conley told the grand jury that Shorthill "swerve[d] ... and force[d] me from the right lane [of the highway] into the left lane", causing Conley to fear that their cars would collide, or that Shorthill's maneuver would force him into the median that separated him from oncoming traffic. But it is not clear that the dashboard video evidence contradicts Conley's testimony.

The incident in question occurred when Conley was driving in the right-hand lane of the highway and Shorthill was beside him to the right, in a merging lane that was about to terminate.

Although "swerved" may have been too strong a word to describe Shorthill's maneuver, the video does show Shorthill's car coming appreciably closer to Conley's patrol car as the merging lane narrowed, with both vehicles on course to occupy the right lane of the highway. Shorthill's apparent intention was to prevent Conley from forcing him onto the right shoulder of the road; he steered his truck so as to enter the right lane, even though Conley's patrol car was in his way.

In other words, the video evidence is at least consistent with, if not directly corroborative of, Conley's testimony that Shorthill intentionally drove toward him and that he (Conley) needed to move left to avoid a collision.

Shorthill also argues that the video evidence shows that a reasonable person in Conley's position would not have perceived a threat of imminent serious physical

injury. This second argument fails for much the same reasons as the first argument. The video evidence is consistent with the conclusion that Conley could reasonably have feared that Shorthill's car would collide with his patrol car — either because Shorthill intended this result, or because Shorthill might misjudge the amount of time and maneuvering room that was available to Conley before he was forced from his lane.

It is true that the video evidence is likewise consistent with Shorthill's theory of the case — that he was only trying to re-enter the main roadway as his merging lane ended, to avoid the danger of being forced onto the right-hand shoulder of the highway. But the fact that the video evidence is arguably consistent with both Shorthill's account and Conley's account does not make it "exculpatory" for purposes of the *Frink* rule — because this evidence does not tend, in and of itself, to negate Shorthill's guilt.

This brings us to Shorthill's argument that the audio recording of his 911 call was exculpatory evidence with regard to the charge of felony eluding. Shorthill argues that this 911 call is exculpatory because his conversation with the 911 operator shows that he genuinely feared the officers, and that he honestly believed that it was not safe to pull over until he reached a public place (in this case, a gas station parking lot).

In this appeal, the State does not contest Shorthill's interpretation of the felony eluding statute, AS 28.35.182 — Shorthill's implicit assertion that a person is not guilty of "knowingly fail[ing] to stop as soon as practical and in a reasonably safe manner" if the person *subjectively* believed that it was unsafe to stop sooner. Indeed, the jury in Shorthill's case was instructed that "[t]o convict Mr. Shorthill [of felony eluding], you must find beyond a reasonable doubt that he knowingly drove past the first place that he actually believed provided a practical and reasonably safe stopping point."

We express no opinion as to whether this is the proper interpretation of the statute. Rather than resolve this question of statutory interpretation, we will decide Shorthill's grand jury claim, and his sufficiency of the evidence claim, on the assumption

that the concept "as soon as practical and in a reasonably safe manner" is defined in terms of the defendant's subjective understanding of the situation.

But even construing the offense in the manner that Shorthill suggests, the 911 audio would not "tend[], in and of itself," to negate Shorthill's guilt.

Shorthill and his wife initially called 911 when Officer Conley started following them just past the Eklutna exit. At that time, Shorthill told the operator that an unmarked police vehicle was following him, that he was driving to a public place before he stopped his truck, and that the operator should tell the officer to "back off".

The next time Shorthill conversed with the 911 operator, he asked her if she had talked with the officers who were following him, and he again demanded that she tell the officers to "back the hell off" because he was "scared for [his] life". Shorthill also mentioned that he wanted to speak with someone in the police department's internal affairs section.

The third time that Shorthill conversed with the 911 operator, he yelled at her that another police officer was in front of him, and he wanted her to get the officers to break off their pursuit. He reiterated that the officers were "scaring [him] to death", and he declared, "This is wrong."

These 911 conversations are consistent with Shorthill's claim that he was genuinely afraid of the officers. However, the 911 conversations can also reasonably be interpreted as proof that Shorthill was acting aggressively, that his anger was escalating each time he spoke with the 911 operator, and that he would only stop when he felt it was appropriate.

Because the 911 calls are susceptible of these conflicting interpretations, they are not the kind of evidence that, standing alone, negates Shorthill's guilt.

We further note that, even without the 911 audio, evidence of Shorthill's mental state was presented to the grand jury. Officer Nelson testified at grand jury that,

after the traffic stop, both Shorthill and his wife told the officers they did not stop their truck sooner because they were in fear for their lives from the police officers. Nelson also told the grand jurors that Shorthill's wife said that they did not stop sooner because they were concerned about putting people in danger if they stopped on the side of the road.

For these reasons, we reject Shorthill's contention that the State violated its duty to present exculpatory evidence to the grand jury.

*The sufficiency of the evidence to support Shorthill's convictions*

Shorthill argues that the evidence presented at his trial was legally insufficient to support his convictions for felony eluding and third-degree assault. When a defendant claims that the evidence is not sufficient to support a criminal conviction, we view the evidence (and all reasonable inferences to be drawn from that evidence) in the light most favorable to the verdict, and we ask whether a reasonable juror could have concluded that the State had proved the defendant's guilt beyond a reasonable doubt. [7]

Shorthill's claims that the evidence was insufficient to support his convictions are primarily based on viewing the evidence in the light most favorable to himself. But as we just explained, this is not the test; we are obliged to view the evidence in the light most favorable to upholding the jury's verdicts.

Viewing the evidence in this light, reasonable jurors could have concluded that Shorthill was guilty of third-degree assault for intentionally steering his vehicle toward Officer Conley under circumstances that caused the officer to reasonably apprehend a danger of imminent serious physical injury.

---

[7] *See*, *e.g.*, *Moore v. State*, 298 P.3d 209, 217 (Alaska App. 2013).

Similarly, reasonable jurors could have concluded that Shorthill was guilty of felony eluding. The evidence supported a reasonable inference that Shorthill's protestations of fear to the 911 operator were not genuine, and that he refused to stop his vehicle because he was angry, because he disliked the police, and because he did not want to yield to them. Likewise, the evidence supported a reasonable inference that Shorthill's driving maneuvers during the police chase amounted to reckless driving (as defined in AS 28.35.400), the other component of the felony eluding charge.

For these reasons, we conclude that the evidence presented at Shorthill's trial was sufficient to support his convictions.

*Conclusion*

The judgement of the superior court is AFFIRMED.